No. 98-018

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 24N

IN RE ESTATE OF KENNETH G. AXVIG,

Deceased.

MORT GOLDSTEIN, DOUG FERKIN and PAT FERKIN,

Appellants,

v.

OLE AXVIG, Individually and as Personal Representative

of the Estate of Kenneth G. Axvig,

Respondent.

APPEAL FROM: District Court of the Twelfth Judicial District,

In and for the County of Hill,

The Honorable Thomas M. McKittrick, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Mort Goldstein; Goldstein Law Firm, P.C.; Havre, Montana

For Respondent:

Maxon R. Davis and Dennis Tighe; Davis, Hatley,

Haffeman & Tighe, P.C.; Great Falls, Montana

Submitted on Briefs: November 12, 1998

Decided: February 18, 1999

Filed:

No

_____

Clerk

Justice Jim Regnier delivered the opinion of the Court.

**¶1. Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent but shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number, and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.**

**¶2. Attorney Mort Goldstein drafted the last will and testament of Kenneth Axvig in which Goldstein, himself, was devisee of one-half of the estate. After Axvig's death, Goldstein attempted to probate the will. Ole Axvig, the decedent's son, was disinherited in the will and filed an adversary proceeding challenging the probate. The matter was tried before a jury which found that Kenneth Axvig was mentally incompetent to execute the will and was unduly influenced by Goldstein. Judgment was entered in the Twelfth Judicial District Court, Hill County, on September 25, 1997. Goldstein appeals various rulings of the District Court. We affirm.**

**¶3. We consolidate the issues in this case as follows:**

**¶4. 1. Did the District Court abuse its discretion when it ruled on various matters involving the parties' expert witnesses?**

**¶5. 2. Did alleged ex parte communications between the District Court Judge and Axvig's attorney result in such prejudice to Goldstein that he is entitled to a new trial?**

**¶6. 3. Should the cumulative effect of the alleged errors committed by the District Court and purported misconduct by Axvig's counsel entitle Goldstein to a new trial?**

**¶7. 4. Did the District Court properly instruct the jury?**

¶8. 5. Did the District Court err in its rulings regarding pretrial publicity and jury selection?

FACTUAL BACKGROUND

¶9. Kenneth Axvig passed away on August 26, 1996, at the age of 80. At the time of his death, he left an estate valued at approximately $1.8 million. The assets of the estate were devised in a will that was prepared by Mort Goldstein, a licensed Montana attorney. The will was executed on January 28, 1996, just seven months before Kenneth Axvig's death. It replaced a prior will in which Kenneth Axvig's son, Ole Axvig, was the sole devisee. Under the new will, Goldstein became attorney and personal representative of the estate, trustee of a testamentary trust, and received one-half of the estate. Friends, relatives, and acquaintances received the remaining half of the estate. Ole Axvig received nothing.

¶10. On September 6, 1996, Ole Axvig (Axvig), the respondent in this case, filed an adversary proceeding in the Twelfth Judicial District Court, Hill County, to challenge the will. A jury trial was held, and on September 25, 1997, a special verdict and judgment were entered in Axvig's favor. The jury found that Kenneth Axvig was mentally incompetent to execute the January 28, 1996, will and was unduly influenced by Goldstein.

¶11. Goldstein appeals this judgment on his own behalf, and on behalf of Doug and Pat Ferkin, who also were devisees. Goldstein seeks review of various rulings of the District Court made before, during, and subsequent to the trial. He challenges certain expert witness testimony, maintains that opposing counsel's ex parte communications with the District Court Judge severely prejudiced him, contends that the District Court improperly instructed the jury, and that he was denied a fair trial on the basis of pretrial publicity and jury bias.

STANDARD OF REVIEW

¶12. Our standard of review of a district court's discretionary rulings is abuse of discretion. *See May v. First Nat'l Pawn Brokers, Ltd.* (1995), 270 Mont. 132, 134, 890 P.2d 386, 388. Similarly, the standard of review of a district court's ruling on expert testimony is an abuse of discretion. *See Cottrell v. Burlington Northern R.R. Co.* (1993), 261 Mont. 296, 301, 863 P.2d 381, 384 (citing *Foreman v. Minnie* (1984), 211

Mont. 441, 445, 689 P.2d 1210, 1212). The standard of review for denial of a motion for mistrial is whether the District Court abused its discretion. *See State v. Partin* (1997), 287 Mont. 12, 17-18, 951 P.2d 1002, 1005. We apply the abuse of discretion standard to a trial court's selection of jury instructions. *See Cechovic v. Hardin & Assocs.* (1995), 273 Mont. 104, 116, 902 P.2d 520, 527. The general rule is that the decision whether to grant a new trial is committed to the sound discretion of the trial judge and will not be disturbed absent a showing of manifest abuse of discretion. *See Newbauer v. Hinebauch*, 1998 MT 115, ¶ 15, 288 Mont. 482, ¶ 15, 958 P.2d 705, ¶ 15.

¶13. The test for abuse of discretion is whether the trial court acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice. *See C. Haydon Ltd. v. Montana Mining Properties* (1997), 286 Mont. 138, 146, 951 P.2d 46, 51. We will not substitute our judgment for the district court's unless it clearly abused its discretion. *See C. Haydon Ltd.*, 286 Mont. at 146, 951 P.2d at 51.

¶14. Previously, we applied the abuse of discretion standard in considering a trial court's refusal to dismiss a prospective juror for cause. However, in *Walden v. State* (1991), 250 Mont. 132, 141, 818 P.2d 1190, 1195, we determined that under Rule 47 (a), M.R.Civ.P., whether a prospective juror holds a preconceived opinion as to the merits of the case or is biased or prejudiced against one of the parties is a factual question to be tried by the trial court. In reviewing a factual determination made by the trial court, Rule 52(a), M.R.Civ.P., applies. Thus, in reviewing the trial court's refusal to excuse a prospective juror for cause, we will reverse a ruling only where the appellant shows that the court's finding is clearly erroneous. *See Walden*, 250 Mont. at 142, 818 P.2d at 1196.

## ISSUE 1

¶15. Did the District Court abuse its discretion when it ruled on various matters involving the parties' expert witnesses?

¶16. At the pretrial conference, the District Court ruled that Axvig could present expert legal testimony over Goldstein's objection. The court determined that the proposed expert witness had specialized knowledge of the law that would assist the jury in establishing a standard of conduct for an attorney working with elderly clients on estate planning. In response to Goldstein's argument, however, the District

Court prohibited the expert witness from making any conclusory statements on the ultimate issue of whether Kenneth Axvig was unduly influenced by Goldstein.

¶17. The District Court denied Goldstein's request to present his own expert legal witness. Goldstein contends that his witness would have testified on the same matters as Axvig's expert witness. However, based on Goldstein's Rule 26(b)(4)(A)(i), M.R. Civ.P., disclosure, the District Court concluded that Goldstein planned to have his witness testify on the relevancy of certain evidence, the appropriateness of certain legal presumptions, and whether a particular conclusion in the case would be logical. The District Court denied Goldstein's request because the nature of this testimony would have invaded the province of the jury.

¶18. Goldstein argues that we should reverse the District Court's rulings. In our view, however, the record establishes that the District Court correctly limited the expert witness testimony and that it did not err when it concluded that the nature of Goldstein's witness's testimony would have invaded the province of the jury.

¶19. During the jury trial, Axvig's expert witness presented testimony related to Rule 1.8(c) of the Rules of Professional Conduct, which provides that a lawyer shall not prepare an instrument that gives the lawyer a substantial gift from the client. Axvig addressed Rule 1.8(c) in his initial complaint and then again in his Rule 26(b)(4)(A)(i), M.R.Civ.P., disclosure. At the pretrial conference, Goldstein argued that testimony relating to Rule 1.8(c) was highly improper because this Court has previously stated that violations of the ethics rules should not give rise to a cause of action or create any presumption that a legal duty has been breached. Axvig responded that Rule 1.8(c) would help the jury to formulate an appropriate standard of conduct for an attorney writing Kenneth Axvig's will. Axvig also contended that Montana law limits the use of Rule 1.8(c) only in malpractice actions.

¶20. The District Court denied Goldstein's motion to preclude testimony related to Rule 1.8(c), but stated that Axvig would have to provide notice to the court and counsel when he was about to offer such testimony and lay a proper foundation before such testimony could be presented. Axvig informed the court at that time that he intended to offer Rule 1.8(c) as evidence during his expert testimony and would submit a proposed jury instruction regarding the Rule.

¶21. In his examination of his expert, Axvig questioned whether Rule 1.8(c) allows an

attorney to draft a document that leaves a testamentary device to him or herself. Goldstein objected on the grounds of lack of foundation, which the District Court overruled. Goldstein argues the District Court improperly allowed the testimony.

¶22. It is important to note that Axvig questioned Goldstein on the witness stand before he presented his expert witness. Axvig asked Goldstein about written assertions Goldstein previously made to the court to the effect that he had informed Kenneth Axvig that drafting the will would be a violation of Rule 1.8. Goldstein further admitted to the jury that Rule 1.8(c) forbade attorneys from receiving gifts. However, he also told the jury that Kenneth Axvig requested him to draft the will in the manner that he did and he essentially did not want to disturb Kenneth Axvig, who was suffering from a weak heart, and thought it best to follow his client's wishes. Axvig's expert was testifying in response to matters raised by Goldstein. We conclude that the record does not reflect an abuse of discretion by the District Court in admitting the evidence.

¶23. Goldstein next argues that Axvig violated the District Court's order prohibiting his expert witness from giving expert opinion testimony on the ultimate issue of the case. In response to a question from Axvig's counsel, the expert testified that language of Kenneth Axvig's January 28, 1996, will presented an issue of undue influence. Goldstein objected and motioned the court for a mistrial. The court denied Goldstein's motion.

¶24. This is not the type of testimony that would justify a mistrial or a reversal of the jury's verdict. More importantly, the District Court stopped the proceedings and read a cautionary instruction to the jury. The jury was specifically instructed to disregard any testimony that gave an opinion on the ultimate issue.

¶25. Goldstein argues that the District Court's instruction was insufficient to remedy the jury's prejudice. We disagree. The District Court properly avoided drawing any more attention than was necessary to the testimony and rejected Goldstein's request to include a direct reference to the comment in its cautionary instruction. We believe the District Court acted fairly and did not abuse its discretion.

## ISSUE 2

¶26. Did alleged ex parte communications between the District Court Judge and

Axvig's attorney result in such prejudice to Goldstein that he is entitled to a new trial?

¶27. Goldstein alleges that soon after Axvig initiated his will contest, opposing counsel had a series of ex parte communications with the District Court Judge. Goldstein believes that in at least one of these meetings, opposing counsel lobbied the Judge to rule in his favor. There was no record or certification of these communications and Goldstein had no notice of them. Goldstein claims that he learned about these meetings three months after the jury entered its special verdict at a disqualification hearing he initiated against the District Court Judge. Goldstein contends that the ex parte meetings materially prejudiced the District Court Judge against him. He also argues that because there was no record or certification of the ex parte communications, he was prejudicially denied the right to make a timely application for an automatic substitution of the District Court Judge.

¶28. At the disqualification hearing that Goldstein initiated three months after the jury trial, opposing counsel testified under oath about conversations he had with the District Court Judge for which there were no records. He admitted that when the District Court Judge was first appointed to the case, he asked the Judge if he knew what he was getting into and if he would have time for it. The Judge responded that he had seen the will and that Axvig would have to prove his case. On another occasion, opposing counsel saw the District Court Judge at the grocery store and the Judge apparently asked opposing counsel the names of the people that attended a previously-held hearing. When, after a different case, another attorney asked opposing counsel how the will contest was going, the District Court Judge apparently entered the conversation saying that the upcoming trial was going to be nasty. During the trial, when the Judge called the parties into his chambers, opposing counsel walked in behind the Judge about ten feet ahead of the others and apologized for raising his voice in the courtroom. Apparently, the Judge replied that the trial was getting rather tiresome. Goldstein also adds that opposing counsel noted on his time records that he personally delivered materials to the Judge, "conferred" with the Judge and had "meetings" with the Judge.

¶29. These ex parte meetings were reviewed at the disqualification hearing involving the District Court Judge. Upon a determination that the Judge should not be disqualified, Goldstein applied to this Court for a writ of supervisory control. Goldstein's petition was denied by this Court on June 30, 1998.

**¶30. Goldstein refers to Montana's Rules of Professional Conduct, the Uniform District Court Rules, the Canons of Judicial Ethics, and Montana case law to support his claim. Rule 3.5 of Montana's Rules of Professional Conduct states that:**

A lawyer shall not:

(a) seek to influence a judge . . . by means prohibited by law;

(b) communicate ex parte with such a person except as permitted by law; or

(c) engage in conduct intended to disrupt a tribunal.

Rule 3(b) of the Montana Uniform District Court Rules requires that prior to the issuance of an ex parte order, the attorney seeking the order must file a certification that the opposing counsel has been given reasonable notice of the proposed ex parte communication. Canon 17 of the Canons of Judicial Ethics provides that

[a] judge should not permit private interviews, arguments or communications designed to influence his judicial action, where interests to be affected thereby are not presented before him, except in cases where provision is made by law for ex parte application.

Canon 4 states that "[a] judge's official conduct should be free from impropriety and appearance of impropriety." In our case law, we have held that a judge should be removed from a case when ex parte communications cause an aura of bias or prejudice and a perceived notion that justice is not being served. *See, e.g., Washington v. Montana Mining Properties* (1990), 243 Mont. 509, 516, 795 P.2d 460, 464-65; *In re Marriage of Miller* (1989), 239 Mont. 12, 19, 778 P.2d 888, 892.

**¶31. We are not convinced that the communications between opposing counsel and the District Court Judge amounted to the level of communication that is prohibited by our rules, cannons of judicial ethics, or case law. Goldstein bases his argument on conclusory statements about the conversations between opposing counsel and the District Court Judge, none of which are based on facts which would justify the grant of a new trial.**

## ISSUE 3

**¶32. Should the cumulative effect of the alleged errors committed by the District Court and purported misconduct by Axvig's counsel entitle Goldstein to a new trial ?**

**¶33. In addition to the alleged District Court errors that Goldstein asserts, Goldstein argues that opposing counsel violated Rule 3.4 of the Rules of Professional Conduct in his closing argument. Rule 3.4(e) prohibits a lawyer during trial from stating his personal opinion as to the justice of a cause, the credibility of a witness, or the culpability of a civil litigant.**

**¶34. Goldstein failed to raise this matter in the District Court. As Axvig points out, Goldstein did not make an objection. A failure to object to the alleged improper closing comments of the opposing counsel precludes an appellant from raising it on appeal. *See Whiting v. State* (1991), 248 Mont. 207, 221, 810 P.2d 1177, 1186.**

**¶35. Just as we do not consider Goldstein's Rule 3.4 argument, we do not consider his argument that the cumulative effects of the District Court's errors and opposing counsel's misconduct warrant a new trial. To date, this Court has applied the doctrine of cumulative error exclusively in criminal cases. *See Baxter v. Archie Cochrane Motors, Inc.* (1995), 271 Mont. 286, 289, 895 P.2d 631, 633.**

## ISSUE 4

**¶36. Did the District Court properly instruct the jury?**

**¶37. For Goldstein to successfully challenge the District Court's jury instructions, he must show prejudice, which can be established only if the jury instructions in their entirety do not state the applicable law of the case. *See Bevacqua v. Union Pacific R. R. Co.*, 1998 MT 120, ¶ 63, 960 P.2d 273, ¶ 63, 55 St. Rep. 469, ¶ 63. A district court has broad discretion in deciding whether to give or refuse a party's proposed jury instruction. *See Fillinger v. Northwestern Agency, Inc.* (1997), 283 Mont. 71, 76, 938 P.2d 1347, 1350. When we examine whether particular jury instructions were properly given or refused, we must consider the instructions in their entirety and in connection with the other instructions given and with the evidence introduced at trial. *See Fillinger*, 283 Mont. at 83, 938 P.2d at 1355; *Busta v. Columbus Hosp. Corp.* (1996), 276 Mont. 342, 359, 916 P.2d 122, 132*; Story v. City of Bozeman* (1993), 259**

Mont. 207, 222, 856 P.2d 202, 211. Without a showing of prejudice, a jury instruction given or refused amounts to nothing more than harmless error.

¶38. Goldstein argues that the District Court failed to give the proper jury instructions on the law of undue influence. He contends that the District Court improperly refused to give his Proposed Instruction No. 29, which provided that "[o]ne influenced by love and affection and gratitude for services performed is not acting under undue influence." This statement comes from the case *In re Estate of Maricich* (1965), 145 Mont. 146, 160, 400 P.2d 873, 880, and has since been incorporated into the elements of undue influence set out in the common law.

¶39. The elements of undue influence require a consideration of the confidential relationship between the person alleged to be exerting undue influence and the testator, the testator's physical and mental condition, the unnaturalness of the disposition, and the time, place, and surrounding circumstances. *See Hauck v. Seright*, 1998 MT 198, ¶ 20, 964 P.2d 749, ¶ 20, 55 St. Rep. 838, ¶ 20. Since the District Court, in Court's Instruction No. 17, addressed the same issues, Goldstein's proposed instruction was superfluous.

¶40. Goldstein next argues that the District Court improperly refused his Proposed Instruction No. 16 on the law of mental competence. He contends that the District Court should have instructed the jury that "[e]vidence that Kenneth Axvig exhibited intermittent or occasional mental incompetence before or after he signed his will may be considered by you but raises no presumption that such condition existed at all times. The issue for you to determine is whether Kenneth Axvig was mentally competent at the time the will was executed."

¶41. Although the District Court did not adopt this exact language, Court's Instruction No. 15 included similar language that "[m]ental incompetency to make a will must be shown to have existed at the very time the will was executed. Evidence of mental condition before and after the execution of the will may be considered in determining the decedent's mental condition at the time the will was executed." Since there is no significant difference between Goldstein's proposed jury instruction and the instruction the District Court used, Goldstein's argument must fail.

¶42. Goldstein also believes that the District Court erred by giving Court's Instruction No. 12 that "[t]he law favors one's own blood relatives as the natural

object of one's bounty." He contends that this is the accurate law of intestate succession, as reflected in *In re Estate of Brewington* (1997), 173 Mont. 458, 568 P.2d 133, but it is not the law regarding succession through wills.

¶43. Although there is some merit in Goldstein's argument, any possible prejudicial effect of the instruction is negated by the entirety of the court's instructions. Court's Instruction No. 14, which has a definite basis in the law of wills, stated that "[t]he provisions of a prior will or wills which are either consistent or inconsistent with the dispositive provisions of the current will may be considered in evaluating the naturalness of the disposition under the current will." *See, e.g., In re Estate of Jochems* (1992), 252 Mont. 24, 28, 826 P.2d 534, 536. Since Kenneth Axvig's prior will disposed of his property to his son, Ole Axvig, the District Court's jury instruction regarding one's own blood relatives as the natural object of one's bounty is not prejudicial under the facts of this case. There is no prejudice in telling the jury that blood relatives are the natural objects of one's bounty when the blood relatives were the subject of the dispositive provisions of the testator's prior will. Court's Instruction No. 13 stated that "[a] will should not be set aside simply because it does not comport with your personal notions of what is just and proper." Finally, Court's Instruction No. 11 stated that "[t]he right to make disposition of one's property by will is a right guaranteed by law and is as valuable as any other property right." We conclude that the jury instructions, in their entirety, stated the correct law, and there was no prejudice.

¶44. Goldstein contends that the District Court erred when it refused his Proposed Instruction No. 28 regarding the definition of alternative devise. Goldstein asserts that an integral part of his case was to establish that he did not intend to receive half of Kenneth Axvig's estate because he knew that the disposition would fail and an alternative devise would go into effect. In his proposed jury instruction, Goldstein asked the court to define alternative devise as "a devise that is expressly created by the will and that under the terms of the will may take effect instead of another devise on the happening of one or more events, including survival of the testator or failure to survive the testator, whether an event is expressed in condition-precedent, condition-subsequent, or any other form." *See* § 72-2-613, MCA.

¶45. We conclude that such an instruction was inappropriate under the facts of this case. The law that is relevant to this case pertains to undue influence and mental competence; thus, the legal definition of alternative devise in an instruction was not

necessary. Certainly it was not error for the District Court to refuse it.

¶46. Goldstein claims that the District Court improperly refused his Proposed Instruction No. 4. His proposed jury instruction stated "[w]here the evidence on an issue of fact is equally balanced, or there is any doubt on which side the evidence preponderates, the party having the burden of proof fails upon that issue. If the evidence touching a disputed fact is equally balanced, or if it does not produce a just, rational belief of its existence, or if it leaves the mind in a state of perplexity, the party holding the affirmative as to such fact must fail."

¶47. The District Court gave a Court's Instruction No. 10 which provided that "[a] party who has the burden of proof must persuade you by the evidence that his claim is more probably true than not true. In other words, the evidence supporting the propositions which a party has the burden of proving, must outweigh the evidence opposed to it." This instruction says the same and is less confusing; thus, there was no error.

¶48. Goldstein also proposed Instruction No. 7: "The burden of proof required of Petitioner Ole Axvig to prove mental incompetence or undue influence can be met only by competent evidence of all facts necessary to a recovery. A verdict for the Petitioner cannot rest upon unwarranted inferences, nor upon conjecture, however shrewd, nor upon speculation, nor upon suspicion, however well grounded it appears." He does not cite to any case law in which we have applied this to a petitioner's burden of proof in a will contest case, and we find none. Thus, his argument for the use of the instruction must fail.

¶49. Finally, Goldstein challenges the District Court's instruction regarding Rule 1.8 (c) of the Rules of Professional Conduct as evidence of Goldstein's undue influence. Court's Instruction No. 19 stated that "[t]he Rules of Professional Conduct . . . prohibit a lawyer from preparing an instrument giving that lawyer any substantial gift from a client, including a testamentary gift, except when the client is related to the lawyer. Whether or not there has been a violation of this prohibition can be considered by you as evidence relevant to the issues of undue influence." Goldstein cites *Carlson v. Morton* (1987), 229 Mont. 234, 745 P.2d 1133, as support to his assertion that the Rules of Professional Conduct are not to be used as a basis for civil liability.

¶50. Axvig contends that our holding in *Carlson* is limited to cases in which parties attempted to use the Rules of Professional Conduct to establish the attorney's standard of care in a malpractice action. We conclude that the District Court did not err by instructing the jury on Rule 1.8(c) to help them to understand the nature of the confidential relationship between Goldstein and Kenneth Axvig which was relevant on the issue of undue influence. Furthermore, in the Court's Instruction No. 20, the District Court stated that "[i]nfluence becomes undue only when it overcomes the true intention of the testator, so that his freedom of choice in making the will is destroyed. In effect, it amounts to the substitution of the intention of another for that of the testator." The District Court did not err in giving Court's Instruction No. 19

## ISSUE 5

¶51. Did the District Court err in its rulings regarding pretrial publicity and jury selection?

¶52. Goldstein asks us to grant him a new trial because he did not have a fair and impartial jury. He asserts that the jury was exposed to misleading newspaper publicity about him. He alleges that the local newspaper prejudicially affected the trial proceedings by publishing information provided by Axvig's friends and a grossly inaccurate portrayal of his intent to take half of Kenneth Axvig's estate. During voir dire, some of the prospective jurors admitted to having preconceived notions about Goldstein. However, Goldstein fails to present any evidence that the newspaper articles caused the prospective jurors to have these notions, or that any of these prospective jurors ultimately sat on the jury. Thus, we deny Goldstein's motion for a new trial on this basis.

¶53. Goldstein next contends that comments made by prospective jurors during voir dire in his disfavor tainted other jurors' notions about him. A comment was made by one juror, "I think he is a crook." Goldstein alleges that much of the panel laughed. He immediately moved the District Court for a mistrial, which the District Court denied.

¶54. We conclude that the District Court did not abuse its discretion when, instead of granting Goldstein a mistrial, it told the prospective jurors that if anyone had an opinion on the case, he or she should take it up outside the rest of the panel so that others would not be influenced by the opinion. The prospective jurors had an

opportunity to express their bias to the District Court, but none of them did so. Later, opposing counsel asked prospective jurors whether any of them thought they did not like Goldstein because of what they had heard about him, and again none of them responded. Thus, we conclude that Goldstein rests his argument that the jurors were prejudicial and biased against him purely on speculation.

¶55. Goldstein cites *State v. McMahon* (1995), 271 Mont. 75, 894 P.2d 313, as support for his argument. In *McMahon*, we held that a jury verdict can be set aside when egregious and prejudicial comments are made by a potential jury member and are heard by the other panel members. However, we stated that:

Our holding in this case should be interpreted narrowly, reserved only for the most egregious and prejudicial prospective juror comments; our holding does not encompass all statements volunteered by prospective jurors during voir dire. It pertains only to those comments which indicate the prospective juror is harboring a bias which he or she cannot lay aside or those comments which, when made in the presence of other prospective jurors, amount to inadmissible opinions or comments about the defendant's character or propensities, thereby poisoning the perspective of the entire jury panel in such a way that the court cannot rectify the problem through admonishment or curative jury instructions.

In future cases, it would be advisable for district courts, before voir dire commences, to advise prospective jurors not to volunteer the substance of any comments or opinions that they may have about the parties. Rather, that they should merely advise the court that they have information (or an opinion) about a party. The trial Judge can then explore the substance of that information *in camera* thereby avoiding any taint to the entire jury panel.

*McMahon*, 271 Mont. at 81, 894 P.2d at 317. Our holding in *McMahon* supports our decision here that the District Court made the appropriate response by instructing the prospective jurors to come forward with their opinions outside the rest of the jury panel. The District Court did not abuse its discretion.

¶56. Finally, Goldstein challenges the District Court's failure to grant his motion to dismiss a potential juror for cause. He argues that his motion should have been granted because the juror was biased against him and because she was incompetent to be a juror.

¶57. Section 25-7-223(7), MCA, allows challenges to jurors for cause when there is evidence of the existence of a state of mind in the juror evincing enmity against or bias in favor of either party. Similarly, § 25-7-223(1), MCA, allows challenges against jurors for cause when there is a want of any of the qualifications prescribed by this code to render a person competent as a juror. As we stated previously, our standard of review for a district court's failure to dismiss a juror for cause is a question of whether the district court's decision was clearly erroneous.

¶58. Goldstein alleges that the juror admitted to being biased against him based on her employment with the hospital where Kenneth Axvig was treated and her association with people who provided health care services to Kenneth Axvig. He further alleges that the juror was not competent to serve on the jury because she noticeably could not stay awake during voir dire, and she admitted that she had been awake for over twenty-four hours and had only four hours sleep in the last two days. He contends that there was no indication that she would be able to stop working in order to get more sleep during the weeks of the trial and that her incompetence was evident despite the District Court's attempt to rehabilitate her through extensive questioning. He further alleges that she succumbed to sleep during a substantial portion of the trial testimony.

¶59. However, Goldstein once again does not present a convincing argument. The record does not support his allegation that the juror was biased against him. According to the record, the juror admitted that she had some opinions, but that her opinions were not about whether Kenneth Axvig was mentally competent to make a will or if he was unduly influenced. Her opinions were collateral to the case. The District Court Judge brought the juror into chambers to question her further and to clarify that her opinions were not about the will. The juror told the judge that she would be able to fairly assess the evidence presented at trial. She also said that a claim against the hospital by Kenneth Axvig's estate would not affect her perspective as a juror.

¶60. Goldstein's allegation that the juror could not stay awake also lacks merit. On our review of the record, it does not appear that Goldstein's challenge of the juror for cause was because of her alleged inability to stay awake. Furthermore, the District Court responded to Goldstein's contentions about the juror's alleged inability to stay awake during the trial by watching her closely and concluding she

was very attentive. Thus, the District Court's decision not to dismiss the juror is supported by the record and is not clearly erroneous.

¶61. In conclusion, we uphold all of the District Court's rulings and affirm the verdict and judgement against Goldstein.

¶62. Affirmed.


/S/ JIM REGNIER


We Concur:


/S/ J. A. TURNAGE

/S/ WILLIAM E. HUNT, SR.

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART