No. 83-353

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

_____

TAYLOR RENTAL CORPORATION,

    Plaintiff and Appellant,

    -vs-

TED GODWIN LEASING, INC.,
FIRST BANK BILLINGS,

    Defendants and Respondents.

_____

APPEAL FROM:  District Court of the Thirteenth Judicial District,
    In and for the County of Yellowstone,
    The Honorable Robert H. Wilson, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Calton & Hammon; Rodd A. Hamman, Billings, Montana

    For Respondents:

        R. P. Ryan, Billings, Montana

_____

Submitted on Briefs:  November 3, 1983

Decided:  April 5, 1984

Filed:    APR 5 1984

                    _Ethel M. Harrison_
_____
                    Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Plaintiff Taylor Rental Corporation appeals and defendant Ted Godwin Leasing, Inc. cross-appeals from the judgment of the Thirteenth Judicial District Court, Yellowstone County. The District Court granted Godwin's motion for summary judgment, holding that Taylor had no security interest in certain rental equipment and that Godwin was entitled to the equipment. The Court awarded Godwin $1,273.30 on its counterclaim for rental under an oral lease agreement. We reverse in part, affirm in part and remand for further proceedings.

The issues are:

1. Was the lease of equipment by Godwin to Cederholm intended as security and therefore subject to the priority rules of the Montana Uniform Commercial Code?

2. Does Taylor have a prior perfected security interest in the rental equipment which entitles it to possession as a secured creditor?

3. Did the District Court err in granting Godwin two months rent on the equipment?

Taylor Rental Corporation (Taylor) is a franchisor of Taylor Rental Centers located throughout the United States. In 1978, Taylor entered into a franchise agreement with Mr. Glen Cederholm (Cederholm) for a Taylor Rental Center in Billings, Montana. Taylor extended financing to Cederholm so that the Billings franchise could obtain a rental inventory. At various times throughout the operation of the Billings Taylor Rental Center, Taylor extended additional financing. As security for this financing, Cederholm granted Taylor a security interest in all machinery, equipment, vehicles and rental inventory held or later acquired by Cederholm for use at the Taylor Rental Center. Five security agreements were

2

executed by Taylor and Cederholm from May 22, 1978 to January 20, 1980. Taylor filed financing statements with the Montana Secretary of State's office with respect to each security agreement.

Late in 1978, Cederholm contacted Taylor regarding acquisition of a U-Cart concrete system for the Billings franchise. The U-Cart system is designed to allow sale of small amounts of concrete to customers who transport the concrete to the place of use in trailers. The system consists of a mixer, a "hopper" and four one-yard trailers. Cederholm also wished to acquire a Lahman loader and trailer for use with the U-Cart system. Taylor advised Cederholm that although the U-Cart system was usually a good income item for franchisees, Taylor was not prepared to finance a system for Cederholm. Taylor advised Cederholm to contact U-Cart or a leasing or financing company to arrange financing.

Eventually, financing was arranged through Ted Godwin Leasing, Inc. (Godwin). The equipment was purchased by Godwin through a loan from First Bank Billings and leased to Cederholm. First Bank filed lien receipts covering the U-Cart trailers with the Montana Registrar of Motor Vehicles. The lien receipts named Godwin as owner and First Bank as secured party. No filings were made with respect to the mixer, hopper or Lahman loader and trailer. Further, the present record contains no specific evidence of a security agreement between First Bank and Godwin. After commencement of this action, Godwin repaid the loan to First Bank and First Bank is no longer a party to this action.

The cost of the U-Cart System was $20,586.00, including $790.00 freight. The cost of the Lahman loader and trailer was $6,025.00. The lease agreements provided for initial

3

payments of $2,029.25 on the U-Cart system and $296.00 on the Lahman loader and trailer. The U-Cart system lease provided for 55 consecutive monthly payments of $488.65 and stated the total amount payable by the lessee was $29,319.00. The Lahman loader and trailer lease provided for 34 consecutive monthly payments of $148.00 and stated the total amount payable by the lessee was $5,328.00 The lease agreements provided that all taxes, insurance, maintenance and license costs were to be paid by Cederholm.

The agreements also provided that the termination value at the end of the lease term would be the "depreciated value," which was specifically set forth in the agreements as $2,100.00 for the U-Cart system and $1,379.00 for the Lahman loader and trailer. If the leases were terminated before the end of the lease term, the termination value would be the depreciated value plus an additional amount for each month remaining before the end of the term.

In the fall of 1980, Cederholm began having financial difficulties in the Billings operation. In November of 1980, Taylor requested that its franchise salesman, Donald Miller, stop in Billings to discuss with Cederholm the future of the franchise. Cederholm indicated he wished to sell the Billings Taylor Rental Center. Accordingly, Walter Wyszynski, Taylor's employee in charge of repossessions, went to Billings around December 15, 1980 to take possession of the store and prepare the business for sale to another Taylor franchisee. Wyszynski began negotiations with Cederholm to arrange a voluntary surrender of the business and to arrange for Taylor to operate the business until sold. As part of these negotiations, Taylor offered to pay Cederholm's monthly payments while Taylor operated the business prior to sale. But Taylor refused to assume underlying obligations, either

4

leases or purchases, and Cederholm therefore refused to agree. The negotiations ceased and Cederholm closed the business.

Taylor filed an action to foreclose on its security agreement and took possession of the rental center as a secured creditor, continuing operation of the business to maintain its resale value. Because Cederholm refused the voluntary surrender of the business, Taylor did not make Cederholm's monthly payments.

Godwin's employee in charge of repossessions, Eldor Baisch, went to the rental center around December 30, 1980 and met with Wyszynski. The District Court found that at that meeting, Wyszynski agreed on behalf of Taylor that Taylor would make monthly payments of $636.35, the total of both lease payments, if Godwin would forego repossession of the equipment and allow Taylor to retain possession so as to enhance the attractiveness of the business. Baisch agreed on behalf of Godwin. The Court further found that Taylor terminated this agreement with Godwin on February 19, 1981 by filing suit for possession of the equipment.

When Cederholm failed to make several payments to Godwin, Godwin threatened repossession. Taylor retained possession of the equipment until December 1, 1981, when it was seized and delivered to Godwin by the Yellowstone County Sheriff, pursuant to a writ of possession issued by the District Court.

Taylor filed this action for declaratory judgment to determine priority of creditors with respect to the U-Cart system and the Lahman loader and trailer. Taylor claimed a prior security interest in the equipment which entitled it to possession. Godwin alleged that Taylor's security interest did not apply to the equipment in question and that Cederholm

5

held the equipment under lease. Godwin filed a counterclaim against Taylor, alleging Taylor had agreed to make payments on Cederholm's behalf pending sale of the business. Godwin moved for summary judgment on Taylor's claim, contending that Taylor had no security interest in the equipment and trial on the counterclaim was reserved pending resolution of Taylor's claim. Taylor also moved for summary judgment, claiming the leases were intended as security and therefore subject to the priority rules of the Montana Uniform Commercial Code, that Taylor's security interest was superior to any Godwin might have, and that Taylor was entitled to possession as a matter of law.

After hearing, the District Court granted Godwin's motion and denied Taylor's motion on August 13, 1981. The District Court certified that there was no reason for delay in entry of partial final judgment. The judgment, opinion and order were filed and Notice of Entry of Partial Judgment was entered on September 25, 1981. Taylor moved the District Court to reconsider its decision and after no action was taken, appealed. After the appeal was filed, the District Court issued a writ of possession and the equipment was seized by the Yellowstone County Sheriff and thereafter possessed by Godwin. On review of the case, this Court found the certification for appeal inadequate and dismissed the appeal without prejudice. See Taylor Rental Corporation v. Ted Godwin Leasing, Inc. (Mont. 1982), 648 P.2d 1168, 39 St.Rep. 1358.

On remand, Godwin's counterclaim was tried and the District Court awarded Godwin two months rent on the equipment in the amount of $1,273.30, based upon its finding that Taylor agreed to pay rental pending sale of the business if Godwin would forego repossession. Taylor appeals the

6

judgment in its entirety. Godwin cross-appeals on the rental award, claiming the District Court should have awarded $7,003.15 in rental for the 11 months Taylor kept possession of the equipment.

I

The first issue is whether the "leases" of equipment by Godwin to Cederholm were intended as security and therefore subject to the priority rules of the Montana Uniform Commercial Code (UCC). Because the District Court concluded that Taylor had no security interest in the equipment, it concluded it was unnecessary to address this issue. However, it is impossible to determine whether Cederholm had sufficient rights in the collateral to grant Taylor a security interest without first determining the nature of the transaction between Godwin and Cederholm. Further, if the "leases" were intended as security, Godwin's interests must compete for priority according to the rules and requirements of Article Nine of the UCC. We conclude that the District Court erred in failing to address this issue and direct the court to address it on remand. For the District Court's guidance, we will comment briefly on the issue.

If the leases in question were not intended as security, Godwin's interest as a lessor is not subject to the UCC priority rules. White and Summers, Uniform Commercial Code §22-3 (2d ed. 1980) (hereinafter referred to as White and Summers). However, the fact that the agreements were entitled "leases" rather than installment sales contracts does not mean that Godwin's interest is not subject to the UCC. Sections 30-9-102(2) and 30-1-201(37), MCA (1979) (some sections of the UCC were amended by the 1983 Legislature, but those amendments are inapplicable to this case); Fire Supply

7

and Service, Inc. v. Chico Hot Springs (1982), 196 Mont. 435, 440, 639 P.2d 1160, 1163.

Section 30-9-102 defines the scope of the UCC provisions on secured transactions:

> "(1) . . . this chapter applies so far as concerns any personal property and fixtures within the jurisdiction of this state:
>
> "(a) to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures . . ..
>
> "(2) This chapter applies to security interests created by . . . lease . . .."

Section 30-1-201(37) sets forth the test for determining whether a lease is intended as security and therefore subject to the UCC:

> "Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security."

Under this section, if the District Court concludes that Cederholm would become the owner or would have an option to become the owner of the equipment for a nominal consideration, it must find that the lease was intended for security and is therefore subject the UCC. Then the question is whether Godwin or Taylor has the superior security interest under the UCC. If Cederholm would not have such an option, it must be determined according to the facts of the case as a whole whether the lease is intended as security. Peco, Inc. v. Hartbauer Tool and Die Co. (Or. 1972), 500 P.2d 708, 709-10.

There is substantial case law which identifies the significant factors in these determinations. As to whether an option to purchase is exercisable at a nominal

consideration, courts often use an "economic realities" test. That is, "if at the end of the lease term the only sensible course economically for the lessee would be for him to exercise his option, the courts generally hold that the transaction is really a secured installment sale and Article Nine applies." White and Summers §22-3 at 881. In applying the economic realities test, some courts state that if the amount the lessee must pay to exercise his option is roughly equal to the fair market value of the asset at that time, then the transaction is not a secured sale. Further, some courts analyze the problem in terms of percentages, comparing the option price to the total list price. White and Summers §22-3 at 881. These approaches appear appropriate to the determination.

In analyzing the facts of the case as a whole to determine whether the leases were intended as security, significant factors include, but are not limited to: (1) whether the lessee acquires any equity in the property; (2) whether the lessee is required to bear the risk of loss; (3) whether the lessee is responsible for all charges and taxes; (4) whether the rent may be accelerated; (5) whether the equipment was purchased specially for lease to this lessee; (6) whether the lessee must provide insurance; and (7) whether the lessor disclaims all warranties. U C Leasing, Inc. v. Laughlin (Nev. 1980), 606 P.2d 167, 170; All-States Leasing Co. v. Ochs (Or. 1979), 600 P.2d 899, 904. These and other relevant factors should be considered by the District Court.

On remand, the District Court is directed to apply section 30-1-201(37), MCA and relevant case law to determine whether the leases of equipment from Godwin to Cederholm were

9

intended as security and are therefore subject to the priority rules of the UCC.

## II

The next issue is whether Taylor has a prior perfected security interest in the rental equipment which entitles it to possession as a secured creditor. Taylor argues that the District Court erred in concluding that Taylor's security interest was not intended to cover this equipment and therefore Taylor had no security interest. In so concluding, the court relied upon the fact that Taylor did not finance the equipment. The court concluded without explanation that the "very generic" language of the after-acquired property clause was insufficient to create a security interest. Taylor contends the court ignored the applicable provisions of the UCC and the plain language of the security agreements and financing statements. We agree.

Section 30-1-201(37), MCA defines a security interest as an interest in personal property or fixtures which secures payment or performance of an obligation. A security agreement may provide that collateral, whenever acquired, shall secure all obligations covered by the security agreement. Section 30-9-204(3), MCA (1979). Security interests in after-acquired property are legitimate security devices under the UCC. Sturdevant v. First Security Bank of Deer Lodge (1980), 186 Mont. 91, 94-95, 606 P.2d 525, 527; White and Summers §23-4.

Sections 30-9-203 and -204, MCA (1977) set forth the steps required to create a security interest. Once these steps are taken, the security interest comes into existence or "attaches." White and Summers §23-1. To obtain a valid security interest in Cederholm's after-acquired property, Taylor had to satisfy these requirements. Section 204(1),

10

MCA requires that the parties have a security agreement, that the secured party give value, and that the debtor has rights in the collateral. First Westside National Bank of Great Falls v. Llera (1978), 176 Mont. 481, 485-86, 580 P.2d 100, 103. Section 203(1), MCA requires that, unless collateral is in possession of the secured party, the debtor has signed a security agreement which contains a description of the collateral.

Cederholm signed five security agreements granting Taylor a security interest in:

"All goods used or useful in the operation of Debtor's Taylor Rental Center or Centers including but not limited to all machinery and equipment, vehicles, furniture and fixtures, all inventory held for sale and all inventory held for rent and further including but not limited to all items listed on any schedule attached hereto, but excluding any trucks and other motor vehicles now owned by Debtor and heretofore separately financed by or through [Taylor] and further excluding any such motor vehicles hereafter acquired by Debtor which at date of acquisition are separately financed by or through [Taylor], whether now existing or hereafter acquired or arising and any and all attachments, additions, replacements, substitutions, accessions, leases, rental agreements and proceeds thereto or thereof (all of the same being hereinafter called the 'Collateral') to secure payment and performance of all the obligations of the Debtor . . .."

These five agreements were executed in May 1978, September 1978, April 1979, June 1979 and January 1980. The instruments granting Taylor a security interest are security agreements within the meaning of section 30-9-105(1)(h), MCA (1979), which defines "security agreement" as "an agreement which creates or provides for a security interest." The agreements are signed by the debtor, Cederholdm, as required by section 30-9-203(1)(b). A financing statement was filed for each security agreement. Each financing statement contained similar descriptions of the collateral. The financing statements named Cederholm as debtor and Taylor as

11

secured party and were signed by Cederholm and a Taylor representative.

Each agreement contains a description of the collateral which expressly includes after-acquired property used in the operation of Cederholm's business or held for rent. Section 30-9-110, MCA (1979) provides that "any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described." An even broader description of collateral was approved in Sturdevant, 186 Mont. at 94-95, 606 P.2d at 527. The District Court's conclusion that a general description is insufficient is erroneous. The description in the agreements clearly includes the U-Cart trailers, mixer and hopper and the Lahman loader and trailer, all of which were acquired between execution of the second and third security agreements and were held for use in or rental by Cederholm's Taylor Rental Center. Taylor and Cederholm were parties to a valid security agreement which applies to the collateral in question.

The District Court's conclusion that Taylor has no security interest in the equipment because it did not finance the equipment is also erroneous. There is no requirement that one must finance the purchase of property to qualify as a secured party with respect to that property. In Sturdevant, we upheld the repossession of property which was not purchased by funds from the loan on which debtor was in default. Sturdevant, 186 Mont. at 95-96, 606 P.2d at 528. No financing requirement appears in the UCC. There is no evidence in the record which contradicts the clear and unambiguous language of the security agreements executed by Cederholm and Taylor. We reverse the holding that Taylor did not intend to have a security interest in this equipment.

12

Section 30-9-204(1) also requires that the secured party give "value" to create a security interest. Section 30-1-201(44)(a) provides that a person gives "value" for rights if he acquires them "in return for a binding commitment to extend credit or for the extension of immediately available credit whether or not drawn upon . . .." Here, Taylor extended financing to allow Cederholm to obtain a rental inventory. This satisfies the value requirement.

Section 30-9-204(1) requires that the debtor acquire "rights in the collateral." Because the District Court has not yet determined whether the leases executed by Godwin and Cederholm are true leases or are in fact disguised installment sales, we cannot determine if or when Cederholm acquired sufficient rights in the collateral to trigger attachment of Taylor's security interest. This issue must be addressed on remand if the leases are found to have been intended as security, necessitating a comparison of Godwin's and Taylor's interests under the UCC.

Godwin presents additional challenges to Taylor's alleged security interest. Godwin argues that the discussion between Taylor and Cederholm regarding financing of the equipment constitutes a subsequently executed oral agreement which modified the existing security agreements so as to exclude the equipment from coverage. However, there is no evidence of any agreement between Cederholm and Taylor to modify the security agreements. Indeed, after Cederholm acquired the equipment, Taylor and Cederholm executed three identical security agreements.

Godwin further argues that Taylor agreed to subordinate its interest to Godwin's, as allowed by section 30-9-316, MCA. However, there is no evidence in the record of any

13

subordination agreement. Godwin argues that Taylor waived its rights in some unspecified manner under the provisions of section 30-2-209, MCA. However, this statute is contained in the article on sales and is inapplicable to this case. Further, Taylor executed no written release of its security interest, a prerequisite to release of a security agreement under section 30-9-406, MCA.

We note that whether Godwin's leases are true leases or leases intended as security, the UCC provides a method by which Godwin could have further protected his interest. The UCC provides for perfection by the financer of the collateral of a "purchase money security interest," which is superior to other security interests. Sections 30-9-107 and -312(3), MCA (1979). Thus, even though it may at first seem unfair that Taylor could obtain possession of the equipment financed by Godwin, Godwin had opportunity to protect his interest by following the simple procedures set forth in the statutes.

If the District Court concludes that the leases were intended as security and that Taylor has a security interest in the equipment, it must determine the relative priority of the competing interests according to the rules of the UCC. Godwin must then come forth with evidence establishing the security interest and method of perfection it relies upon. Further, the separate items of equipment must be treated separately, because the statutes require different methods of perfection for different categories of collateral. Sections 30-9-302(3)(b); 30-9-401(1); 61-3-103(1), MCA (1979). The use of the mixer, hopper and loader in conjunction with motor vehicles does not make them motor vehicles as suggested by the findings of the District Court and they should not be treated as motor vehicles.

The final issue is whether the District Court erred in granting Godwin two months rent on the equipment. The District Court found that:

"On or about the 30th day of December, 1980, Mr. Baisch [Godwin's employee] went to the Billings Taylor Rental Center and met with Walter Wyszynski. At that meeting, Mr. Wyszynski on behalf of Taylor Rental Corporation agreed that Taylor would make the payments under the lease agreements if Ted Godwin Leasing, Inc., would forego repossession and allow Taylor to keep the U-Cart System in place in the business for the purpose of making the business more attractive to a subsequent purchaser or take-over franchisee. Mr. Baisch, acting for Ted Godwin Leasing, Inc., agreed to this offer."

The District Court further found that this oral month-to-month lease was terminated when Taylor filed this action in February 1981, so that Taylor was liable to Godwin for two months rent, or $1,273.30.

Taylor argues that if it was legally entitled to possession of the equipment under the UCC, it could as a matter of law have no obligation to make lease payments to Godwin. Godwin argues that Taylor promised to make the payments and that Taylor should be held liable for those payments for the full eleven months during which Taylor kept possession of the equipment.

The District Court did not base its rental award on who was entitled to possession. Rather, the court found that Taylor expressly promised to make Cederholm's rent payments. Even if Taylor was entitled to possession, nothing precluded Taylor from agreeing with Godwin to make those payments. We therefore find no error in the court's award of rental. Further we find no error in the court's conclusion that Taylor terminated the at-will agreement by filing suit. This finding is supported by substantial evidence.

We therefore affirm the judgment of the District Court with respect to Godwin's counterclaim for rental payments and remand the cause to the District Court for further proceedings consistent with this opinion.

_____
Justice

We concur:

John Conway Harrison

Daniel J. Shea

John C. Sheehy

16

L.C. Gulbrandson.
Justices