No. 00-683

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 235


DANIELS-SHERIDAN FEDERAL CREDIT UNION,

Plaintiff, Respondent and Cross-Appellant,

v. .

LELAND BELLANGER a/k/a LELAND H. BELLANGER, BOBBI JO

HACKMAN f/k/a BOBBI JO BELLANGER, and LARRIE SMITH,

Defendants and Respondents.

_____

ALFRED BELLANGER,

Applicant and Appellant,

v.

JAMES P. KRAMER, SHERIFF OF DANIELS COUNTY,

STATE OF MONTANA,

Respondent and Respondent.

APPEAL FROM: District Court of the Fifteenth Judicial District,

In and for the County of Daniels,

The Honorable David Cybulski, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Dirk Larsen; Larsen Law Firm, Great Falls, Montana (for Alfred

Bellanger)

For Respondents:

Fred E. Whisenand (argued); Crowley, Haughey, Hanson, Toole & Dietrich,

Williston, North Dakota (for Larrie Smith)

Shane P. Coleman (argued), Charles W. Hingle; Dorsey & Whitney, Billings, Montana (for Daniels-Sheridan Federal Credit Union)

Heard: May 31, 2001

Submitted: June 5, 2001

Decided: November 30, 2001

Filed:

_____

Clerk

# Chief Justice Karla M. Gray delivered the Opinion of the Court.

¶1 Daniels-Sheridan Federal Credit Union initiated this action to enforce promissory notes pursuant to the Uniform Commercial Code (UCC). The case subsequently broadened to encompass disputes over proceeds of the sale of cattle seized from Leland Bellanger. The Fifteenth Judicial District Court, Daniels County, ultimately entered judgment in the Credit Union's favor against Leland Bellanger and his former spouse, now known as Bobbi Joe Hackman, who had executed the promissory notes. The court also adjudicated the priority of security interests asserted by the Credit Union and Larrie Smith to cattle sale proceeds on deposit with the Daniels County Clerk of Court, and concluded Alfred Bellanger is not entitled to any of the cattle sale proceeds. Alfred Bellanger appeals and the Credit Union cross-appeals. We affirm on the direct appeal and reverse on the cross-appeal.

¶2 We address the following restated issues:

¶3 1. Did the District Court err in ruling Alfred Bellanger had no agister's lien or other interest in the cattle?

¶4 2. Did the District Court err in awarding the Credit Union $25,000 in attorney fees and costs?

¶5 3. Did the District Court err in equitably subordinating the Credit Union's prior, perfected security interest in Leland Bellanger's cattle to Larrie Smith's security interest in some of the cattle?

## BACKGROUND

¶6 In the late 1980s, Leland Bellanger began running cattle on Daniels County property owned by his father, Alfred Bellanger. Leland obtained loans from the Credit Union to finance his ranching operation. The loans at issue are evidenced by promissory notes executed by Leland in 1993, 1994, and 1995. Bobbi Jo signed two of the 1994 notes jointly with Leland. The promissory notes secured the loans, in pertinent part, with "ALL CATTLE OWNED OR ACQUIRED, INCLUDING INCREASE, BRANDED OR UNBRANDED, INCLUDING PROCEEDS AND PRODUCTS THEREOF[.]" Upon execution of each note, the Credit Union filed UCC financing statements and continuation financing statements containing the "owned or acquired" provision with the Montana Secretary of State.

¶7 The Credit Union brought this action in 1999, after Leland and Bobbi Jo defaulted on the loans. It sought a $33,631 judgment against Leland and a $22,882.59 judgment against Leland and Bobbi Jo jointly, together with interest as specified in the promissory notes. The complaint also named Larrie Smith, owner and manager of Sitting Bull Auction where Leland customarily sold his cattle, as a defendant. The Credit Union alleged Smith had an inferior security interest in some of Leland's cattle which Smith had sold to Leland and financed in 1997 and 1998.

¶8 Smith counterclaimed, alleging Leland had obtained only a leasehold interest in Smith's cattle and that Smith had retained ownership of those animals. As a result, Smith contended the value of those cattle was not subject to the Credit Union's security interest.

¶9 Alfred requested leave to intervene, claiming an agister's lien on Leland's cattle for having kept them on his land. After the District Court denied Alfred's request, he applied for a writ of mandamus to require the Daniels County Sheriff to enforce his agister's lien. Alfred's action was "incorporated with" the Credit Union's action.

¶10 All parties to both actions stipulated to the Daniels County Sheriff seizing all cattle in Leland's possession and delivering them to Glasgow Stockyards, Inc. Under the court-approved stipulation, the cattle would be inspected and separated by brand and sold, with the net proceeds delivered to the Daniels County Clerk of Court.

¶11 Net proceeds in the amount of $79,012.27 subsequently were deposited with the Clerk of Court from the sale of the cattle. The Credit Union, Alfred, and Smith then filed claims for payment.

¶12 The District Court held a bench trial and entered Findings of Fact, Conclusions of Law, and Judgment. It ordered the Clerk of Court to pay the Credit Union $45,467.94, significantly less than Leland and Bobbi Jo's total indebtedness on the promissory notes, and Smith $33,544.33, of the deposited proceeds. The court granted the Credit Union judgments of $73,951.50--including attorney fees--against Leland, plus interest, and against Bobbi Jo and Leland jointly in the amount of $3,137.37, plus interest. Finally, the District Court foreclosed Leland and Alfred of all interest to the cattle sale proceeds.

## DISCUSSION

¶13 1. Did the District Court err in ruling Alfred Bellanger had no agister's lien or other interest in the cattle?

¶14 On appeal, Alfred asserts that he holds an agister's lien on all cattle pastured on his land on and after October 7, 1997. He also asserts entitlement to an equitable lien on the cattle under an implied contract with the Credit Union.

¶15 An agister's lien is created when there is "an express or implied contract for keeping, feeding, herding, pasturing, or ranching stock." *See* § 71-3-1201(1), MCA. The person to whom stock is entrusted "has a lien upon the stock for the amount due for keeping, feeding, herding, pasturing, or ranching the stock and may retain possession of the stock until the sum due is paid." Section 71-3-1201(1), MCA.

¶16 Alfred testified at trial that he lived in Great Falls, Montana, over 300 miles from his

Daniels County property. Alfred testified further that Leland ran cattle on the land rent-free, in exchange for looking after Alfred's cattle. On that basis, the District Court found Alfred never had custody or control over the cattle for pasture, hay or care. The court also found, based on Leland's testimony, that Leland admitted Alfred filed the agister's lien to hinder Bobbi Jo's efforts to collect on a judgment against Leland. The court found Leland and Alfred "did not enter into any express or implied contract or agreement for the care of the cattle on any form of a 'for hire' basis, the cattle feed, etc[.,] was part of a compensation plan between father and son." Based on the record and the District Court's unchallenged findings, we conclude that Alfred lacked both possessory and contractual bases for a valid agister's lien.

¶17 Alfred contends on appeal that his agister's lien commenced via an implied contract on August 10, 1999, when the Credit Union obtained a preliminary injunction against the removal or sale of any cattle from his Daniels County property. He maintains that order imposed a duty on him to care for the cattle located on his property, citing §§ 27-1-222, 45-8-211, and 70-6-206, MCA.

¶18 Section 27-1-222, MCA, allows for exemplary damages for wrongful injuries to animals committed willfully or by gross negligence; § 45-8-211, MCA, provides penalties for failing to care for an animal within a person's custody; and § 70-6-206, MCA, applies to a "depositary"--a person given possession of personal property to keep for the benefit of another--of living animals. Given the court's finding that Alfred never had custody or control of the cattle, the statutory duties on which Alfred relies in support of his "implied contract" agister's lien are inapplicable. Nor has Alfred cited to any authority under which an agister's lien may be created in any manner other than pursuant to § 71-3-1201, MCA.

¶19 We hold the District Court correctly concluded Alfred had no agister's lien or other interest in the cattle.

¶20 2. Did the District Court err in awarding the Credit Union $25,000 in attorney fees and costs?

¶21 The promissory notes provided that the Credit Union would be entitled to recover costs and attorney fees incurred to collect amounts due on the loans to Leland and Bobbi Jo. The District Court awarded the Credit Union $25,000 for its attorney fees and costs. Alfred contends the record does not support the reasonableness of the award. We decline to reach the merits of his contention, because we conclude Alfred does not have standing

to raise this issue.

¶22 In order to have standing on appeal, a party must be able to show an interest in the subject matter of litigation which has been injuriously affected by the judgment or order. *Matter of Dearborn Drainage Area* (1988), 234 Mont. 331, 336, 766 P.2d 228, 231 (citation omitted). Alfred was not a party to the Credit Union action. Instead, he asserted his claimed agister's lien via his application for a writ of mandamus brought against the Daniels County Sheriff. As discussed above, Alfred did not establish the agister's lien under § 71-3-1201, MCA, or any other interest in the proceeds from the cattle sale. Absent any interest in the proceeds, Alfred cannot show that such an interest was adversely affected by the amount of attorney fees awarded to the Credit Union.

¶23 We conclude Alfred lacks standing to raise this issue and decline to address it further.

¶24 3. Did the District Court err in equitably subordinating the Credit Union's prior, perfected security interest in Leland Bellanger's cattle to Larrie Smith's security interest in some of the cattle?

¶25 At trial, the Credit Union urged its perfected security interest in all of Leland's cattle pursuant to its financing statements filed with the Montana Secretary of State. It argued Smith had only an unperfected purchase money security interest in proceeds from sale of the seized cattle because he had failed to properly perfect a security interest in Leland's cattle under the UCC. Smith, on the other hand, argued that he had leased--not sold-- certain of the seized cattle to Leland. As a result, according to Smith, those cattle were not subject to the Credit Union's security interest in Leland's cattle. Alternatively, Smith asserted he had preserved an equitable interest in those cattle.

¶26 In ruling on the sale/lease question, the District Court took a somewhat creative tack, stating that the Smith-Leland transaction "could be" characterized as a "semi lease-purchase." It went on to determine that Smith had an equitable interest in the cattle he provided to Leland. The court found the Credit Union knew or should have known of the arrangement between Leland and Smith from obvious deductions in checks Smith made out to Leland for previous sales of calves of those cows at Smith's auction house and from inspecting and seeing Smith's brand on the cattle. The court found it would be inequitable, and result in unjust enrichment, to allow the Credit Union to recover proceeds of the cattle delivered by Smith to Leland, noting that the Credit Union did not advance funds or suffer any detriment because of the Smith cattle. The Credit Union contends the District Court

erred in several respects.

¶27 Article 9 of the UCC, codified in Montana at §§ 30-9-101 through -628, MCA (1999), applies to transactions, regardless of form, which are intended to create a security interest in personal property. *See* § 30-9-102, MCA (1999). It also establishes a hierarchy of priorities for such security interests. *See* Title 30, Chapter 9, Part 3, MCA (1999). Specifically, §§ 30-9-301 and -302, MCA (1999), provide generally that a financing statement is required to perfect all security interests and an unperfected security interest is subordinate to the rights of a person statutorily entitled to priority. Pursuant to § 30-1-103, MCA, principles of law and equity may supplement the UCC to the extent they are not displaced by provisions of the UCC.

¶28 By filing its financing statements with the Montana Secretary of State, the Credit Union complied with the § 30-9-302, MCA (1999), requirements for perfecting its security interest in "all cattle owned or acquired" by Leland and Bobbi Jo. Montana recognizes the validity of after-acquired property clauses in security interests. *See* § 30-9-204, MCA (1999); *Taylor Rental Corp. v. Ted Godwin Leasing, Inc.* (1984), 209 Mont. 124, 135-36, 681 P.2d 691, 697. The Credit Union's security interests in after-acquired cattle owned by Leland and Bobbi Jo have priority as of the 1993, 1994, and 1995 dates the financing statements were filed on the 1993, 1994, and 1995 promissory notes. *See* § 30-9-303, MCA (1999). In this regard, the District Court properly found that the Credit Union "is the only creditor (and party to this action) having a perfected security interest in the Defendants, Leland Bellanger and Bobbi Jo . . . Hackman's cattle, and the proceeds thereof."

¶29 As the Credit Union points out and the District Court found, Smith failed to perfect any security interest in the cattle in which he claims an interest by failing to file financing statements with the Montana Secretary of State. Smith did not file a § 30-9-302, MCA (1999), financing statement. Nor did he preserve a purchase money security interest-- which might have given him a priority over certain other creditors--by filing a financing statement pursuant to § 30-9-301, MCA (1999), within 20 days after Leland, the debtor, received possession of the cattle.

¶30 As the Credit Union further points out, the District Court's "semi lease-purchase" characterization of the Smith-Leland transaction begs the threshold question under this issue. If the transactions were actually sales to Leland, then the Credit Union has a security interest in the cattle and the Credit Union's and Smith's respective interests must

be sorted out pursuant to the UCC. If, on the other hand, the transactions were true leases, then Smith owns the cattle and the Credit Union's security interest does not attach to them. *See Taylor*, 209 Mont. at 131-33, 681 P.2d at 695.

¶31 The 48-cow deal between Smith and Leland is memorialized by a November 22, 1997 promissory note. In the note, Leland agreed to pay $29,680 to the order of Smith or his spouse "[f]or the sale of 48 cows," $100 per cow per year plus 12% interest per annum, with payments "to be made when the calves are sold." The note further provided "[c]ows are to be branded JLR.R. [Smith's brand] until the final payment is made. Then a Bill of Sale will be issued by the Seller."

¶32 Smith asserts this note did not fully document the agreement between him and Leland. He points out that the cattle in which he claims an interest were either branded with his brand or he had bills of sale for them.

¶33 In fact, the November 1998 and 1999 bills of sale introduced into evidence show that only 2 of the cows at issue had Smith's brand; the rest had third-party brands and, like the cattle with Smith's brand, were listed on the bills of sale with Smith and Leland as joint purchasers. Moreover, the District Court did not adopt Smith's proposed finding that Smith did not transfer ownership of the cattle to Leland. Instead, the court adopted Smith's equitable argument to disallow the Credit Union from recovering proceeds from the so-called Smith cattle under the UCC.

¶34 The District Court expressly found that, at the time of the transactions between Leland and Smith, Leland himself thought he was purchasing the cattle from Smith. Moreover, Leland's promissory note in Smith's favor clearly indicates a sale, not a lease, by the words "[f]or the sale of 48 cows." Smith has not persuasively rebutted that indication.

¶35 In another line of argument that the Smith-Leland transactions were not sales, Smith compares the facts in the present case to those in *Rohweder v. Aberdeen Production Credit Ass'n* (8th Cir. 1985), 765 F.2d 109. There, the Eighth Circuit Court of Appeals vacated a summary judgment in favor of a secured creditor based on a factual question as to whether a bailment had been created. The case involved the relative rights to cattle of a creditor claiming a security interest under the UCC and a third party who had pastured and cared for the cattle. *Rohweder*, 765 F.2d at 111. The factual question was whether the "share agreement" pursuant to which the owner of the cattle delivered them to the third party was a bailment, in which case the creditor's security interest could not attach. *Rohweder*, 765

F.2d at 113.

¶36 Smith argues that Leland's interest in the cattle was a bailment. Unlike *Rohweder*, however, the present case was not decided on summary judgment and no factual question exists on the bailment argument. After hearing the evidence, the District Court rejected Smith's proposed finding that a bailment had been created and Smith has not cross-appealed on that decision. In any event, as noted above, the District Court analyzed whether Smith had established an equitable interest superior to the Credit Union's UCC priorities. In doing so, the District Court impliedly found a sale of the cattle from Smith to Leland, because the Credit Union would not have had a secured interest in those cattle unless they belonged to Leland. *See Taylor*, 209 Mont. at 131-33, 681 P.2d at 695.

¶37 We conclude the Smith-Leland transactions were sales, not leases. As such, the hierarchy of priorities for security interests set forth in Article 9 of the UCC applies in the Credit Union's favor, absent some exception thereto.

¶38 The remaining question is the correctness of the District Court's conclusion that Smith has a $33,544.33 priority interest in the proceeds of the sale of the cattle in which he claims an interest under equitable principles. The Credit Union contends the District Court's conclusion--for which no case law was cited--is erroneous.

¶39 We previously have addressed the subject of equitable principles and the UCC. In *Rudio v. Yellowstone Merchandising Corp.* (1982), 200 Mont. 537, 652 P.2d 1163, we refused to displace Article 9 priority rules with equitable principles except to the extent expressly provided in the UCC. There, secured creditors with an inferior security interest argued that a priority secured creditor had waived his security interest in proceeds of the liquidation sale of a business by giving implied consent to that sale. We held that whether the secured creditor waived his security interest had no bearing on his right to the proceeds of the sale as against competing creditors, because the UCC provides that waiver or implied consent to a sale only affects the secured creditor's priorities as against the purchaser. *Rudio*, 200 Mont. at 546-47, 652 P.2d at 1168.

¶40 In *Northwest Potato Sales, Inc. v. Beck* (1984), 208 Mont. 310, 678 P.2d 1138, a potato dealer appealed a district court's dismissal of its breach of contract claim which was based on Charles Beck's failure to honor a contract to sell it seed potatoes. Beck asserted a statute of frauds defense on the basis he had never signed the written contract signed by the potato dealer and forwarded to him. The potato dealer raised estoppel as a bar to the

defense. We reversed, holding that Beck had both actively and passively led the potato dealer to believe the written contract would be honored and, as a result, Beck was estopped from asserting a statute of frauds defense to the contract action. In doing so, we rejected Beck's argument that estoppel cannot apply to a UCC statute of frauds transaction, noting that § 30-1-103, MCA, expressly mentions estoppel as one of the general principles of law that supplements the UCC, absent an express displacement of the principle elsewhere. We ultimately determined that no provision of the UCC precludes application of estoppel to defeat a statute of frauds defense. *Northwest*, 208 Mont. at 315-16, 678 P.2d at 1141.

¶41 Smith attempts to apply our recognition in *Northwest* that equitable remedies can supplement the UCC to the present case, but *Northwest* is readily distinguishable. *Northwest* did not address the priority of secured interests and, indeed, did not relate to secured interests in any way. Moreover, unlike in *Northwest*, the equitable principle of unjust enrichment urged by Smith--and adopted by the District Court--is not mentioned in the UCC as one of the general principles of law which can supplement the UCC's specific hierarchy of priorities for security interests at issue here.

¶42 Smith also advances *Ninth Dist. Production Credit Ass'n v. Ed Duggan, Inc.* (Colo. 1991), 821 P.2d 788, in support of the unjust enrichment theory embraced by the District Court. There, Ed Duggan, Inc., claimed entitlement to compensation for corn it had delivered to a failing cattle feedlot business. The issues concerned the relative rights of Duggan, an unsecured creditor of the feedlot business, and the local production credit association (PCA), a creditor with a security interest in the proceeds of the feedlot's accounts receivable. The Supreme Court of Colorado held that the doctrine of unjust enrichment could supplant UCC provisions and require the secured creditor to compensate an unsecured creditor to avoid being unjustly enriched. *Duggan*, 821 P.2d at 793-94. The court held, moreover, that the evidence which had been presented could support a jury finding of unjust enrichment to the PCA: the PCA permitted the continued operation of the feedlot in anticipation of closing a sale rather than liquidating the business; the PCA was the source of all operational funds for the feedlot, controlled payment of all of its obligations, and received the proceeds of all its accounts receivable; the PCA was informed every time corn was ordered from Duggan and never objected to any purchase; and Duggan continued to deliver corn to the feedlot under these circumstances. *Duggan*, 821 P.2d at 798.

¶43 Smith acknowledges that, even for the *Duggan* court, mere acquiescence is not

sufficient to justify the application of unjust enrichment principles unless the equitable claimant's acts were essential to the actual preservation of the secured collateral. *See Duggan*, 821 P.2d at 797 n.17. The *Duggan* court limited its holding by stating "[a] secured creditor can protect itself from unjust enrichment claims by remaining uninvolved or by informing the proper parties of its intent not to pay for debts incurred in maintaining, enhancing, or making additions to secured collateral." *Duggan*, 821 P.2d at 798.

¶44 Here, the record supports a determination that the Credit Union remained uninvolved in the Smith-Leland transaction. There was no evidence that the Credit Union encouraged Smith to sell Leland cattle on credit, and the District Court found that Smith never contacted the Credit Union to inform it of his arrangement with Leland nor requested from the Credit Union a waiver or release of its security interest in Leland's and Bobbi Jo's cattle. At most, the record indicates the Credit Union was aware of, and acquiesced in, the Smith financing only after it occurred, when Smith deducted payments to himself from the Credit Union's checks for sales of calves from the cattle he provided to Leland. Even under *Duggan*, 821 P.2d at 798, mere after-the-fact acquiescence is not sufficient to upset UCC priorities. Furthermore, the Credit Union's perfected security interest expressly included after-acquired cattle such as those sold by Smith to Leland. Thus, assuming arguendo that *Duggan*'s unjust enrichment approach has validity, that case is factually distinguishable from the case presently before us.

¶45 Moreover, *Duggan* has "been subjected to critical comment, some of which is unusually hostile." *Knox v. Phoenix Leasing, Inc.* (Cal. Ct. App. 1994), 35 Cal.Rptr.2d 141, 146 (citations omitted). Specifically, *Duggan* has been criticized for its willingness to allow restitution claims to disrupt the UCC's priority system for secured creditors.

> The reasons supporting the primacy of the Article 9 scheme are unquestionably weighty. Article 9 has been in place for more than three decades. Its requirements are by now familiar and integrated into commercial practice. The corresponding benefit is the stability that is essential to a healthy business climate. Compliance with the obligations of article 9 should have a positive consequence.
>
> A secured creditor which has complied with all relevant code requirements to perfect its security interest, should therefore start with something like a presumption in its favor. The whole point of article 9 is to establish a comprehensive scheme affording maximum protection to the secured creditor who has followed its provisions.

*Knox, 35 Cal.Rptr.2d at 146.*

¶46 In *Knox*, Phoenix Leasing financed a business known as Domaine Laurier Winery and obtained a UCC security interest in Domaine's property. When the business failed, Phoenix acquired defaulted debtor Domaine's property, including French-made wine barrels which Knox had sold to Domaine. Knox had not been paid in full for the wine barrels and sought restitution from Phoenix for their value. Reversing the trial court, California's First District Court of Appeals held that Phoenix was not liable to pay Knox for the barrels.

> The trial court's conclusion has an undeniable common sense allure--Knox provided barrels; Phoenix ended up with the barrels; Phoenix should therefore pay Knox for their value. Ordinarily this would be sound reasoning supporting an equitable result. Article 9, however, compels a different conclusion. Phoenix complied with statutory provisions intended to immunize secured creditors from such claims in all but the rarest of cases. As this is not that sort of case, the equitable impulse for restitution must yield to the Legislature's command.

*Knox, 35 Cal.Rptr.2d at 149 (citations omitted). The California Court of Appeals did not define the "rarest of cases" in which unjust enrichment might supplant UCC priorities, nor need we do so here.*

¶47 On these facts, we conclude an equitable carve-out from the UCC's hierarchy of priorities is not justified. We hold that Smith failed to demonstrate that any equitable interest he may possess in the cattle he sold to Leland displaces the Credit Union's perfected security interest in those cattle as after-acquired property of Leland and Bobbi Jo. Therefore, we reverse the District Court's determination that Smith has a priority interest in the sale proceeds from Leland's cattle entitling him to $33,544.43 plus interest.

¶48 Affirmed in part and reversed in part.

/S/ KARLA M. GRAY

We concur:

/S/ JAMES C. NELSON

/S/ PATRICIA COTTER

/S/ JIM REGNIER

/S/ W. WILLIAM LEAPHART

/S/ TERRY N. TRIEWEILER

/S/ JIM RICE