No.   89-577

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

DENNIS R. WASHINGTON,
        Plaintiff and Respondent,
    -v-
MONTANA MINING PROPERTIES, INC.,
a Montana Corporation,
        Defendant and Appellant,
    and
ASARCO, INC., a New Jersey Corporation,
        Plaintiff and Respondent.
    and
MONTANA MINING PROPERTIES, INC.,
a Montana Corporation, and LAITH
REYNOLDS and OLIVE J. SMITH,
        Defendants and Appellants,
MONTANA MINING PROPERTIES, INC.
a Montana Corporation,
        Plaintiff and Appellant
    -v-
ASARCO, INC., a New Jersey Corporation,
and DENNIS R. WASHINGTON, et al.,
                Defendants



APPEAL FROM:   District Court of the Second Judicial District,
               In and for the County of Silver Bow,
               The Honorable Frank M. Davis, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

        W.D. Murray, Jr, Butte, Montana
        Anthony F. Phillips, New York, New York

        For Respondent:

        Ronald B. MacDonald, Missoula, Montana
        Ross Richardson; Henningsen, Purcell, Vucurovich &
        Richardson; Butte, Montana
        Laura B. Houguet; White & Case, New York, New York


                    Submitted on Briefs:  April 26, 1990

                           Decided:  July 13, 1990

Filed:

                        Clerk

Justice R. C. McDonough delivered the Opinion of the Court.

Petitioner Montana Mining Properties, Inc., (MMP) has petitioned this Court for a writ of supervisory control disqualifying Judge Mark P. Sullivan from preceding further in this case. In its petition, MMP maintains that Judge Sullivan should be disqualified due to his relationship with the law firm representing the respondent, Dennis R. Washington. The writ is granted and we direct that this action be assigned to another judge.

The sole issue on appeal is:

Whether a writ of supervisory control disqualifying a presiding judge should issue when: (1) his son is employed by counsel of record for the respondent, Dennis R. Washington, (2) he knows and associates with partners of that law firm on a social basis, and (3) the petitioners raise questions concerning his ability to impartially preside over the case.

On June 19, 1987, Dennis Washington (Washington) entered into a contract with MMP for the sale of two mining properties and equipment, which are located in Butte, Montana. The first property, the "Main Butte Property" was sold to MMP for three million dollars in cash. Both parties agree this sum has been paid.

The second parcel of property sold for $500,000 and the equipment located on this property sold for three million dollars. Half of the price for the equipment was to be paid in cash. The parties agree that this part of the contract has been performed.

2

The dispute here arises from the contract which provides that the $500,000 for the second parcel of property, and $1.5 million representing the balance of the price of the equipment may be paid in "unrestricted free trading common stock" of a public company, called Butte Mining PLC. This company was organized and promoted in London by Clive J. Smith, who was one of four joint venturers who controlled MMP. The joint venture used MMP as a vehicle to acquire mining properties that were then transferred to Butte Mining PLC. Shares in this company were then sold in public stock offerings.

The agreement between Washington and MMP provided that the stock, which represented the $1.5 million balance of the purchase price for the equipment, was to be transferred to Washington no late than September 15, 1987. The stock representing the $500,000 due on the property was transferred on November 27, 1987. The agreement stated that time was of the essence with respect to both payments, and it contained an express termination clause, pursuant to which Washington was entitled to terminate the contract in the event of default. The agreement contained provisions which granted to MMP, a "first right of refusal" to acquire an interest in any mineral property owned by Washington in the Butte Mining District.

The shares of stock were delivered to a firm of accountants, Bryant & Co., in Jersey, Channel Islands. Apparently, the delivery of both stock payments was made on time. In October of 1987, Peter Bryant notified Washington, through a letter, that his firm was holding 312,500 shares of common stock which were made payable "to

the order of" Washington. This delivery represented the $500,000 due under the contract for the land. A subsequent letter from Bryant advised Washington that he was releasing to Washington's order an additional 937,000 shares, which represented the $1.5 million balance due on the equipment.

Washington does not deny receiving these letters. However, he maintains that he never gained possession, dominion or control over the stock. In support of this contention, Washington testified that he was never sent any documents regularly disseminated to Butte Mining PLC shareholders, nor given dominion over the shares. He maintained that when he attempted to sell the shares, he was unable to do so because Smith retained control over the escrow where the stock was held. In light of these circumstances, Washington maintained that he was not paid the monies due him under the contract.

Eventually, Washington, deeming MMP in breach of the contract, brought a lawsuit on March 14, 1989. In his complaint, he sought to terminate all of MMP's rights under the agreement. MMP answered the complaint and denied the allegations of breach of contract. In short, MMP maintained that its deliveries of stock to the holding company constituted valid deliveries and that it had, therefore, met its obligations under the contract.

On April 25, 1989, Washington publicly announced that he had entered into an agreement with ASARCO, Inc. Under this agreement, Washington agreed to sell certain mining properties, located in Butte, to ASARCO. MMP deemed this agreement a violation of its

right of first refusal contained in its contract with Washington. It brought a lawsuit seeking a preliminary injunction to prohibit consummation of the arrangement and also sought tort and contractual damages against both Washington and ASARCO.

A hearing was held relative to MMP's request for an injunction on May 22 and 23, 1989. At this hearing, the primary issue was whether MMP had violated the terms of its contract with Washington. Obviously if MMP was in breach, and Washington was entitled to terminate the contract, MMP was not entitled to enforce its right of first refusal.

At the hearing, both sides presented testimony concerning the stock transfers. The law firm of Datsopoulos, MacDonald and Lind P.C., of Missoula, Montana, represented Washington. As part of his case, Washington called Milton Datsopoulos, one of the named partners of that firm, to testify concerning the various payment arrangements. Dennis Washington, Clive Smith, and Kelvin Myers, an employee of Bryant & Co., also testified.

The trial judge, the Honorable Mark Sullivan, determined that MMP had not validly transferred the stock to Washington. Judge Sullivan found that Washington did not have dominion or control over the stock and therefore MMP had not validly made the payments under the contract. He further found that this was a material breach since it represented a failure of a significant part of the consideration. Judge Sullivan, therefore, denied MMP's request for an injunction.

Following the injunction hearing, MMP was informed that Judge

Sullivan's son was employed as a legal intern by Datsopoulos, MacDonald and Lind. This fact led counsel for MMP to question a number of rulings made by Sullivan during the injunction hearing. In particular, MMP questioned the judge's ruling which allowed Milton Datsopoulos to testify when his law firm was actively representing one of the defendants to the action. According to MMP, Datsopoulos sat at counsel table during the hearing and actively assisted in Washington's defense. Judge Sullivan's decision to allow his testimony, MMP maintains, is in direct contravention of Rule 3.7(a) of the Montana Rules of Professional Conduct which states:

> A lawyer shall not act as an advocate at trial in which the lawyer is likely to be a necessary witness except where:
>
> (1) the testimony relates to a non-contested issue;
>
> (2) the testimony relates to the nature and value of legal services rendered in the case; or
>
> (3) disqualification of the lawyer would be a substantial hardship on the client.

None of these exceptions apply here. The suspicions generated by Judge Sullivan's rulings and his relationship with the Datsopoulos law firm, led counsel for MMP to request that Judge Sullivan remove himself from further proceedings in the case. According to MMP's brief, they met with the Judge on June 2, 1989 and made this request, which was denied. In this same meeting, Judge Sullivan apparently informed attorneys for MMP that he considered his findings of fact and conclusions of law, which were contained in his order denying their request for an injunction, to

6

be final. MMP maintains that such statements are contrary to established law, which dictates that findings made in a preliminary injunction hearing are not conclusive to any subsequent trial. Moreover, MMP argues that such statements, which were made prior to any discovery in the case, clearly indicate that Judge Sullivan is prejudiced.

MMP, following this conversation, filed a motion to disqualify Judge Sullivan. Pursuant to this motion, this Court ordered the Honorable Frank Davis to conduct a hearing and to determine whether Judge Sullivan should be disqualified. While this motion was pending, a newspaper reporter observed Judge Sullivan at a football game with Milton Datsopoulos and Ronald MacDonald, both of whom are partners in the Datsopoulos firm. According to uncontradicted testimony, Judge Sullivan did not attend the football game with either of these gentlemen. Rather, he unexpectedly ran into Mr. MacDonald, who then invited the Judge to his firm's stadium box for a drink. He accepted this invitation and enjoyed one drink and conversation with the two lawyers for approximately 10-15 minutes. The conversation only involved football and neither Judge Sullivan nor the lawyers spoke about any issues surrounding the case in controversy.

Despite the innocent nature of this conversation, the newspaper reporter who observed the activity wrote an article which appeared in The Montana Standard on September 23, 1989. The article briefly described the status of the case, including the disqualification proceeding, and contained quotes from both Mr.

MacDonald and Judge Sullivan.

On September 11, 1989, the parties presented written argument concerning Judge Sullivan's disqualification, to Judge Davis. The arguments included an affidavit which was submitted by Judge Sullivan. It generally defended his actions taken in the case. MMP maintains that through his submission of this affidavit, Judge Sullivan overstepped his bounds as a disinterested, impartial judge and stepped into the role as advocate and maintains that this further evidences bias on his part.

Following submission of the parties' arguments, Judge Davis entered an order denying MMP's motion. MMP petitioned this Court for a writ of supervisory control. In its briefs in support of that petition, MMP requested this Court to exercise its extraordinary powers to direct the lower court to disqualify Judge Sullivan from all further proceedings in the case.

The only issue we must face is whether a writ of supervisory control should issue. We address this issue in two parts. First we review Judge Davis' order and determine whether he correctly held that Judge Sullivan need not disqualify himself. Second, we must view all of the facts surrounding the controversy in order to determine whether Judge Sullivan should be disqualified because the facts create an appearance of impropriety.

Judge Davis based his decision primarily upon his interpretation of the disqualification statute, which states in relevant part:

> Any . . . judge . . . must not sit or act in any action or proceeding:

8

. . .

        2.    When he is related to either party or any
attorney or member of a firm of attorneys of record for
a party by consanguinity or affinity within the fourth
degree, computed according to the rules of law;

In his opinion and order, Judge Davis determined that Judge Sullivan's son, who was a legal intern for Datsopoulos, MacDonald and Lind was not "an attorney or member of a firm of attorneys of record for a party . . ." He based this conclusion on the fact that Sullivan's son was not an attorney and not a member of the Bar. Accordingly, he was not and could not be a "member" of the Datsopoulos law firm.

We do not disagree with this interpretation of the statute. The wording of § 3-1-803, MCA, is clear. If the legislature intended to provide that a judge disqualify himself when a member of his family interned for a law firm appearing before him, it could easily have provided that "employees," or "student interns" are covered by the statute. It chose not to do so, however, and we decline MMP's invitation to add these words. When the wording of a statute is clear, its words will be interpreted by their plain meaning. Montana Assoc. of Underwriters v. State Dept. of Admin. (1977), 172 Mont. 211, 563 P.2d 577.

Having determined that Judge Davis did not incorrectly determine that Judge Sullivan should be disqualified under the language of § 3-1-803, MCA, we must consider whether we should exercise our extraordinary power of supervisory control to remove Judge Sullivan on the basis that his actions have created an "appearance of impropriety." A review of the policies behind our

9

constitutional power of supervisory control is appropriate before we consider this issue.

The power to issue writs of supervisory control is derived from Article VII, Section 2, of the Montana Constitution which states:

> **Section 2. Supreme court jurisdiction.** (1) The supreme court has appellate jurisdiction and may issue hear, and determine writs appropriate thereto. It has original jurisdiction to issue, hear, and determine writs of habeas corpus and such other writs as may be provided by law.
> (2) It has general supervisory control over all other courts.

This provision grants this Court supervisory control over all inferior courts within the State. This power is separate and distinct from the Court's appellate jurisdiction. This Court has observed that it is a power which is called into use when necessary to meet exigent circumstances for which no express remedy has been provided. State ex rel. Whiteside v. First Judicial District Court (1900), 24 Mont. 539, 63 P. 395. Its primary purpose is to "keep the courts themselves within bounds, and to insure the harmonious working of our judicial system." Whiteside, 63 P. at 399. The writ should only be issued in extraordinary situations. State ex rel. Topley v. District Court (1918), 54 Mont. 461, 171 P. 273.

Mindful of these policies, we conclude that a writ of supervisory control is appropriate in this case. The petitioners have recited numerous facts which could indicate bias on the part of Judge Sullivan. The fact that his son interns for the Datsopoulos law firm together with the fact that Judge Sullivan has associated on a social basis with members of that firm do not

10

require disqualification. However, these facts when viewed in light of other circumstances surrounding the case, including Milton Datsopoulos' testimony, and the newspaper article describing the meeting at the football game, have snowballed to create an appearance of impropriety.

Rule 4 of the Canons of Judicial Ethics requires that a judge's conduct should be free from the appearance of impropriety. Factors present in this case, in particular the newspaper article, render the realization of this standard a virtual impossibility.

Additionally, we note that Rule 33 of the Canons of Judicial Ethics requires a judge, when engaged in pending or prospective litigation, to be particularly careful to avoid any action that may reasonably tend to awaken the suspicion that his social or business relations or friendships constitute an element in influencing his judicial conduct. The facts here have raised questions of impropriety. They evidence an impression of impropriety and bias.

Justice must satisfy the appearance of justice. Jones v. City of Chicago, 610 F.Supp 350, (N.D.Ill.E.D. 1984). As eloquently stated by Lord Hewart,

> . . . a long line of cases shows that it is not merely of some importance but is of fundamental importance that justice should not only be done, but should manifestly and undoubtedly be seen to be done. Nothing is to be done which creates even a suspicion that there has been an improper interference with the course of justice. Rex v. Sussex Justices (1924), 1 k.b. 256, 259.

The people's confidence in the ability of the courts to administer justice must not be diminished. A state ruled by law cannot afford any perceived notion that justice is not being served

11

by the judiciary. It is for this reason, that we grant MMP's petition for a writ of supervisory control. We emphasize that such action by this Court is only undertaken under extraordinary circumstances. However, the events involving the lower court have created an aura of possible bias or prejudice. In order to remedy this situation as well as to protect the integrity of the judiciary as a whole, the writ is granted and the Court hereby orders that this action be assigned to another district judge who has not participated heretofore in this case.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

12

Justice John C. Sheehy, dissenting:

From the record here, it does not appear that Montana Mining Properties, Inc. has much of a case. To mask its lack of substance, Montana Mining Properties, Inc., through its counsel, has mounted a vengeful attack on the impartiality and integrity of a judicial officer.

This litigation involves essentially two questions: 1) did Montana Mining Properties breach its contract of purchase with Dennis R. Washington; and, 2) does Montana Mining Properties (hereinafter MMP) have any right of first refusal as to other mining properties proposed to be sold by Dennis R. Washington to ASARCO, Inc?

Under MMP's contract with Washington, MMP was required to pay balances on the contract to Washington by certain dates in U.S. dollars or in "unrestricted, free trading" common stock of the same value. The record before us is clear that MMP neither paid Washington the balance due in U.S. dollars at the times required, nor did it provide him with unrestricted and free-trading common stock as the alternative. Therefore, MMP breached the contract and is not entitled to an injunction.

The second question relates to a right of first refusal, which was included in the contract between MMP and Washington. The right of first refusal applied to other mining properties held by Washington in the Butte area. Washington made a deal for the sale

13

of certain of those properties or an interest therein to ASARCO. Washington gave notice to MMP of the proposed offer, and MMP has not at any time met or tendered the amounts of money necessary to meet the first refusal requirement. Aside from its obvious breach of contract, if a right of first refusal existed in MMP, the latter did not or could not meet the offer, which takes care of the first refusal issue.

In the light of the record, District Judge Sullivan properly denied MMP's request for a temporary injunction to stop the ASARCO deal. Upon the denial of the injunction, Washington and ASARCO completed their deal. Although the temporary injunction was denied, the principal action itself remains undecided in District Court. It is possible, but only barely possible, it seems to me, that MMP might have other evidence to turn the tables as to the contract breach. Yet MMP did not appeal the denial of the temporary injunction. Instead, it mounted its attack against Judge Sullivan, and eventually District Judge Frank Davis was called in to determine whether Judge Sullivan should be disqualified. Judge Davis denied the disqualification after the hearing, concluding properly, I think, that "the appearance of impropriety was mostly in the eye of the loser."

The alleged impropriety turns on three incidents: (1) the temporary employment of Pat Sullivan as an intern for the law firm representing Washington; (2) a ten-minute conversation between District Judge Sullivan and Ronald MacDonald, one of Washington's attorneys, at a football game; and (3) the permission by Judge

14

Sullivan to allow the testimony of Milton Datsopoulos as a witness in the temporary injunction hearings.

The employment by law firms of law school students as temporary interns is common in Montana. It is a recognition by the law firms of this State that support of our Law School is increased by offering hands-on law office experience to law school students. Washington's law firm employs five or six of such interns per year. Such employment, particularly when the intern has never been directly involved in the case at issue does not qualify as a basis for disqualification of a district judge. Canon 3C, Canons of Judicial Ethics relating to the disqualification of a judge because of relationship applies only if the relative is "acting as a _lawyer_ in the proceeding." The commentary under that Canon, published by the American Bar Association, is as follows:

> The fact that a lawyer in a proceeding is affiliated with a law firm with which a lawyer-relative of the judge is affiliated does not of itself disqualify the judge. Under appropriate circumstances, the fact that "his impartiality might reasonably be questioned" under Canon 3C(1) or that the lawyer-relative is known by the judge to have an interest in the law firm that could be "substantially affected by the outcome of the proceeding" under Canon 3C(1)(d)(iii) may require his disqualification.

Here the employment of Pat Sullivan as an intern does not meet any of the propositions set forth in the commentary. In fact, he was not a _lawyer_ when acting as an intern. Pity the sons and daughters of district judges in the future who as law students will not be selected as interns because of the jeopardy the majority opinion now places on such employment.

15

The facts pertaining to the association of District Judge Sullivan with Ronald MacDonald, of Washington's law firm, at a University football game are far overblown. It is a common experience for attenders at such football games to be invited for a short visit at one or other of the several plush boxes maintained by law firms and corporations of Montana at the University stadium. As a result, such boxes are usually crowded, with much passing in and out by visitors. This Court should not countenance such a casual contact as indicating bias unless we are willing to examine strictly our own tendencies. We have just returned from the annual meeting of the State Bar of Montana, where probably every member of this Court associated at cocktail parties and other events with counsel from around the State, many of whom have pending before this Court appeals or other original proceedings. To hold that such contacts, including casual visits at a University stadium football box, indicate bias is nothing more than silly.

The third point is the testimony of Mr. Datsopoulos at the injunction hearing itself. Milton Datsopoulos was called to the stand, and his testimony was objected to as follows:

> MR. PHILLIPS: Your Honor, we object to this witness testifying concerning material matters in dispute of this case. He's appeared here at the counsel table as counsel of record.
>
> MR. MACDONALD: May I be heard with regard to that, your Honor? I am laying this as foundation. There have been a number of statements that have been made with regard to Mr. Datsopoulos' participation. Mr. Myles has testified, for our benefit for the first time, that it's his understanding Mr. Datsopoulos authorized the holding of stock as was testified by Mr. Clive Smith.

16

It comes somewhat as a surprise to us, and I believe that it is appropriate to call Mr. Datsopoulos who hasn't participated materially other than some comic relief with these proceedings.

THE COURT: I am going to allow it. Overruled. You may proceed in question.

In the majority opinion, Rule 3.7(a) of the Montana Rules of Professional Conduct is cited, which states that a lawyer shall not testify as a witness when he is an advocate at the trial, with three exceptions. One of those exceptions is where "disqualification of the lawyer would work substantial hardship on the client." In the case at bar, it was the contention of MMP that its delivery of stock to an escrow holder in the Channel Islands was in fact delivery of stock to Mr. Washington. The effect of the Smith testimony was that Mr. Datsopoulos had authorized such a delivery of the stock. Washington's interests would be substantially affected if Smith's testimony were not contravened. Yet the majority holds that the exception contained in the Montana Rules of Professional Conduct does not apply, saying "None of these exceptions apply here." Thus, this Court, without an appeal, has decided an issue that should have been raised by appeal. In any event, on the record here, the ruling of District Judge Sullivan with respect to the lawyer's testimony was correct.

All through the majority opinion, it is evident the majority can find no fault, no bias, no partiality or improper orders made by the District Court. The majority can find no direct fault with the ruling of District Judge Davis that disqualification of Judge Sullivan was not necessary. Yet the majority, saying in effect

17

that they could never convict Judge Sullivan of bias, nevertheless convict him on the basis of a perceived appearance of impropriety. The majority have attenuated judicial integrity to the breaking point, in a case without warrant for such action.  I dissent.

_____
                Justice