IN THE SUPREME COURT OF THE STATE OF MONTANA
Supreme Court Cause No. DA 08-0352

ESTATE OF EARL M. PRUYN, ACTING THROUGH
THE PERSONAL REPRESENTATIVE JACK MEYER,

Appellant/Plaintiff,

v.

AXMEN PROPANE, INC., a Montana corporation,
and EDWARD KIMBRELL, individually,

Appellee/Defendants.

---

## REPLY BRIEF OF APPELLANT

---

On Appeal from the Fourth Judicial District Court, Missoula County

---

Appearances:

Randy J. Cox
Scott M. Stearns
Thomas J. Leonard
BOONE KARLBERG P.C.
201 West Main, Suite 300
P.O. Box 9199
Missoula, MT 59807-9199
Telephone: (406) 543-6646
Facsimile: (406) 549-6804
rcox@boonekarlberg.com
sstearns@boonekarlberg.com
tleonard@boonekarlberg.com
*Attorneys for Appellant*

David B. Cotner
Trent N. Baker
DATSOPOULOS, MACDONALD & LIND
201 West Main, Suite 201
Missoula, MT 59802
Telephone: (406) 728-0810
Facsimile: (406) 543-0134
dcotner@dmllaw.com
tbaker@dmllaw.com
*Attorneys for Appellee*

Edward N. Kimbrell
1410 Pinnacle Falls
San Antonio, TX 78260
Telephone: (210) 462-9108

# TABLE OF CONTENTS

Page

I. THE DISTRICT COURT ERRED IN OVERTURNING
ITS PRIOR SUMMARY JUDGMENT ORDER ...................... 1

    A. Kimbrell Acted With Ostensible Authority To Bind Axmen ........ 1

    B. Kimbrell Had Actual Authority to Speak for Axmen's Board ....... 2

    C. Axmen's Motion for Reconsideration Was Improper ............. 5

        1. There Was No Newly Discovered Evidence ................ 5

        2. There Was No Manifest Error or Extraordinary
        Circumstance ...................................... 6

    D. Axmen's Motion Was Denied After 60 Days ................... 7

    E. Judge Henson's Order Was the Law of the Case ................. 8

II. THE DISTRICT COURT ERRED IN GRANTING SUMMARY
JUDGMENT TO AXMEN ON BREACH OF CONTRACT .............. 8

    A. The District Court Disregarded Undisputed Facts ................ 8

    B. Axmen Is Liable Under the UCC ........................... 10

    C. The Parol Evidence Rule Does Not Apply ..................... 12

III. THE DISTRICT COURT ERRED IN GRANTING SUMMARY
JUDGMENT TO AXMEN ON UNJUST ENRICHMENT ............. 13

    A. Pruyn Should Recover In Equity If the Note Does Not
    Bind Axmen ......................................... 13

B. Pruyn Did Not Waive His Claim By Accepting Payments . . . . . . . . . 14

C. Pruyn Satisfied the Elements of Unjust Enrichment . . . . . . . . . . . . . . 15

D. The UCC Does Not Preclude Pruyn's Claim In Equity . . . . . . . . . . . 17

IV. THE DISTRICT COURT ABUSED ITS DISCRETION IN
GRANTING AXMEN ITS ATTORNEY FEES . . . . . . . . . . . . . . . . . . . . . . 17

A. The Equitable Exception Does Not Apply . . . . . . . . . . . . . . . . . . . . . . . 17

B. The Court Should Give Effect to Montana's Statutes,
Not Washington's or California's . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

V. AXMEN'S *EX PARTE* COMMUNICATIONS TO THE DISTRICT
COURT VIOLATED PRUYN'S DUE PROCESS RIGHTS . . . . . . . . . . . . . 19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

# TABLE OF AUTHORITIES

Page

## CASES

### Federal Cases

*Old Person v. Brown,*
   312 F.3d 1036 (9th Cir. 2002) .......................... 8

### State Cases

*Bekkedahl v. McKittrick,*
   2002 MT 250, 312 Mont. 156, 58 P.3d 175 ..................... 19

*Carelli v. Hall,*
   279 Mont. 202, 926 P.2d 756 (1996) ................... 11, 12, 13

*Daniels-Sheridan Federal Credit Union v. Bellanger,*
   2001 MT 235, 307 Mont. 22, 36 P.3d 397 ...................... 17

*Estate of Pruyn v. Axmen Propane, Inc.,*
   2008 MT 329, 346 Mont. 162, 194 P.3d 650 ..................... 7

*Fjelstad v. Montana Dept. of Highways,*
   267 Mont. 211, 883 P.2d 106 (1994) ........................ 6

*In re Marriage of Rock,*
   257 Mont. 476, 850 P.2d 296 (1993) ........................ 17

*Johnson v. Eagles Lodge Aerie 3913,*
   284 Mont. 474, 945 P.2d 62 (1997) ......................... 8

*Maxted v. Barrett*
   198 Mont. 81, 643 P.2d 1161 (1982) ........................ 13

*Northwest Polymeric, Inc. v. Farmers State Bank,*
236 Mont. 175, 768 P.2d 873 (1989) ........................ 1

*Phelps v. Union Central Life Ins. Co.,*
105 Mont. 195, 71 P.2d 887 (1937) ........................ 4

*Real Estate Loan Fund Oreg. Ltd. v. Hevner,*
709 P.2d 727 (Or. App. 1985) ........................ 4, 5

*Rex v. Sussex Justices,*
1 K.B. 256 (1924) ........................ 20

*Rudio v. Yellowstone Merchandising Corp.,*
200 Mont. 537, 652 P.2d 1163 (1982) ........................ 17

*Shields v. Helena School District No. 1,*
284 Mont. 138, 943 P.2d 999 (1997) ........................ 6

*Survco v. Kenyon Noble Ready-Mix,*
204 Mont. 411, 664 P.2d 943 (1983) ........................ 14

*Tanner v. Dream Island, Inc.,*
275 Mont. 414, 913 P.2d 641 (1996) ........................ 18

*Teamsters Union Local No. 2 v. C.N.H. Acquisitions, Inc.,*
2009 MT 92, ___ Mont. ___, 204 P.3d 733 ........................ 8

*VanDyke Construction Co., Inc. v. Stillwater Mining Co.,*
2003 MT 279, 317 Mont. 519, 78 P.3d 844 ........................ 14

*Washington v. Montana Mining Properties, Inc.,*
243 Mont. 509, 795 P.2d 460 (1990) ........................ 19, 20, 21

## STATUTES

Mont. Code Ann. § 28-3-704 .................................. 18, 19

Mont. Code Ann. § 28-10-403 ................................. 1

Mont. Code Ann. § 30-3-403(1) ............................... 11, 12

Mont. Code Ann. § 30-3-404(1) ............................... 12

Mont. Code Ann. § 30-3-406 .................................. 11, 12

## RULES

Mont. R. Civ. P. 59(d) ...................................... 7

Mont. R. Civ. P. 60(b)(2) ................................... 6

Mont. R. Civ. P. 60(c) ...................................... 7

## MISCELLANEOUS

Cal. Civ. Code 1717(a) ...................................... 19

RCW 4.84.330 ................................................ 19

Richard E. Flamm, *Judicial Disqualification*, § 5.6.4 (1996) ............... 20

## I. THE DISTRICT COURT ERRED IN OVERTURNING ITS PRIOR SUMMARY JUDGMENT ORDER.

Reading Axmen's brief, one might conclude this litigation began not in July 2004, but some three years later when Judge Deschamps granted summary judgment to Axmen. Axmen characterizes all matters pre-dating Judge Deschamps' ruling as minor "procedural" issues not warranting remand. Axmen is wrong. Judge Henson's initial order granting summary judgment to Pruyn was correct, and the reversals of that order were procedurally and substantively improper.

### A. Kimbrell Acted With Ostensible Authority To Bind Axmen.

Judge Henson correctly ruled that Axmen's president, Kimbrell, bound Axmen on the promissory note. Axmen professes ignorance of the loan transaction, and insists its ignorance proves absence of Kimbrell's ostensible authority. But ostensible authority exists if, "by want of ordinary care," Axmen allowed Pruyn to believe Kimbrell possessed the requisite power to bind the company. *See* Mont. Code Ann. § 28-10-403. Ostensible authority "may be established by *omissions* as well as by commissions." *Northwest Polymeric, Inc. v. Farmers State Bank* (1989), 236 Mont. 175, 178, 768 P.2d 873, 875 (emphasis added).

As demonstrated in its brief, Axmen does not dispute it made Kimbrell managing partner/president of the company and allowed him virtually unchecked control over Axmen's operations. Axmen does not dispute it never told Kimbrell the

scope of his borrowing and purchasing authority. Axmen does not dispute it did nothing to correct the understandable perception that Kimbrell, as president, had authority to bind the company. Axmen acknowledged that the "level of awareness" of Axmen's other owners, Grant and Guy Hanson, was lacking. (CR 22, Ex. A, 84:6-15.) Nonetheless, Axmen contends Pruyn should have done more and is stuck with the loss.

Axmen argues "Pruyn's assertion that Kimbrell had ostensible authority to bind Axmen cannot rely upon facts discovered after the Note was signed." (Axmen's Brief, p. 12.) While it is true that facts supporting Pruyn's *reasonable reliance* are those facts known to Pruyn at the time of the loan transaction, other facts are not irrelevant. The facts establishing Axmen's lack of ordinary care in controlling Kimbrell – whether known to Pruyn at the time or not – go to the heart of ostensible authority. Because of Axmen's negligence, Pruyn *could not have known* about now-claimed limits on Kimbrell's authority before it was too late.

With respect to Pruyn's knowledge of the Powderhorn transaction, it makes no difference whether Kimbrell told Pruyn the money was going to pay a debt to Powderhorn, buy new tanks in the Bitterroot, or purchase a company condo in the Bahamas. The question is whether Kimbrell sought the loan on the company's behalf, and whether Pruyn reasonably believed Axmen's president could bind

2

Axmen. Despite bald assertions the loan was personal to Kimbrell, Axmen does not dispute that Kimbrell sought the loan, at least ostensibly, in his representative capacity as Axmen president. Indeed, the money went to pay an Axmen debt and was never converted to Kimbrell's benefit. Nevertheless, Axmen claims Pruyn should not have trusted its president.

Seeking to portray Pruyn's reliance on Kimbrell as unreasonable, Axmen presents misleading excerpts from Pruyn's deposition. (Axmen's Brief, pp. 12-15.) Axmen cites Pruyn's admittedly spotty recollection of his *very first meeting* with Kimbrell, in which Kimbrell informed Pruyn he was "running the propane business" and provided Pruyn with certain company documentation. Still, Pruyn *denied* the initial loan request. (CR 22, Ex. D, 65:12-25.) Axmen then skips forward to this part of the transcript:

Q.  (By Axmen's attorney) . . . Do you recall any other conversations you had with Ed Kimbrell before the money was wired out of your account?

A.  No.

(Axmen's Brief, p. 15 (quoting CR 22, Ex. D, 81:14-20).)

Axmen skips over everything between Pruyn's initial meeting with Kimbrell and his making the loan. This misleading portrayal of the record is telling. Axmen disregards that Pruyn met with Kimbrell on several occasions following the initial

3

meeting, reviewed extensive company documentation provided by Kimbrell, and conducted an independent investigation into the operations of the company. (CR 22, Ex. D, 44:15-24; 56:9-57:16; 89:12-23.)

Axmen correctly notes that a person dealing with a known agent may not "blindly trust the agent's statements as to the extent of his powers." (*See* Axmen's Brief, pp. 15-16 (citing *Phelps v. Union Central Life Ins. Co.* (1937), 105 Mont. 195, 71 P.2d 887, 889.)) It is remarkable that Axmen makes this argument. Axmen, by its own admission, blindly trusted Kimbrell to run the company, yet criticizes Pruyn for not nailing down the precise extent of Kimbrell's powers – something Axmen itself never did.

## B.   Kimbrell Had Actual Authority to Speak for Axmen's Board.

Axmen ignores that Kimbrell had authority to relay the decision of the Axmen board to Pruyn, even if he lacked authority to bind the company on his signature alone. Pruyn reasonably relied on Kimbrell's representation that all members of Axmen's board approved the loan. *See Real Estate Loan Fund Oreg. Ltd. v. Hevner* (Or. App. 1985), 709 P.2d 727.

4

## C. Axmen's Motion for Reconsideration Was Improper.

Axmen claims its motion for reconsideration was appropriate because of "manifest errors of law or fact," and "newly discovered or previously unavailable evidence." *See id.* In reality, Axmen's motion was just what Axmen said it was: a motion filed "in lieu of . . . an appeal." (CR 41.5.)

### 1. There Was No Newly Discovered Evidence.

Axmen's "newly discovered evidence" was a police interview of Dennis Starkel, the attorney who drafted the promissory note, taken a year and two months before Judge Henson granted summary judgment to Pruyn. Axmen claims the date of the statement is immaterial, and the date it became "available" is what counts. Tellingly, Axmen never reveals that date. Nor does Axmen say when or how it obtained the Starkel statement. Instead, it asserts, without citation to the record, that the statement was not "available" for the initial summary judgment proceedings.

Axmen does not explain why it was able to obtain Starkel's statement for Judge McLean, but unable to do so for Judge Henson. The fact is, Axmen knew of the Starkel statement from the very beginning because Rich Ochsner, former Missoula police detective and business partner of the Hansons, was involved in the

underlying criminal investigation.[1] Axmen has never disputed it was aware of the Starkel statement from the moment it was taken. Still, it did nothing to bring the statement to light until it lost on summary judgment and hired new lawyers. This does not make the evidence "new." The evidence must be that "which by due diligence could not have been discovered [earlier]." Mont. R. Civ. P. 60(b)(2); *see also Fjelstad v. Montana Dept. of Highways*, (1994) 267 Mont. 211, 220, 883 P.2d 106, 111. Axmen has made no such showing.

## 2. There Was No Manifest Error or Extraordinary Circumstance.

Axmen's motion for reconsideration was not based upon "manifest error" or "extraordinary circumstances," but on Axmen's dissatisfaction with Judge Henson's ruling. *See Shields v. Helena School District No. 1*, (1997) 284 Mont. 138, 143, 943 P.2d 999, 1002. Axmen's arguments did not change and, except for the immaterial and cumulative Starkel statement, neither did the evidence. Axmen's attempt to relitigate the case before a new judge, "in lieu of an expensive and time consuming appeal" (CR 41.5, p. 2), was contrary to the rules.

---

[1] In the underlying criminal matter, it was at the hearing to suppress Ochsner's interview of Kimbrell that Judge Deschamps offered to recuse himself because of his close relationship with the Axmen partner, Ochsner. (CR 135.1.)

In what amounted to an intermediate appeal, Axmen claims Judge Henson's decision was manifestly wrong in two respects: (1) he failed to cite to the UCC, and (2) he ignored disputed facts. Axmen fails to mention it did not raise the UCC in response to Pruyn's motion for summary judgment. (CR 23.) To the extent this was error, it was Axmen's error. Further, as set forth below, the UCC supports Pruyn's position.

The undisputed facts relative to Kimbrell's ostensible authority have already been discussed. Far from "manifestly wrong," Judge Henson was correct in granting summary judgment to Pruyn.

### D. Axmen's Motion Was Denied After 60 Days.

Judge McLean was required to rule on Axmen's motion for reconsideration within 60 days from the date of filing. Mont. R. Civ. P. 60(c), 59(d); *see also Estate of Pruyn v. Axmen Propane, Inc.*, 2008 MT 329, ¶ 5, 346 Mont. 162, 194 P.3d 650. He did not, and the motion was deemed denied.

Axmen argues, without authority, that the 60-day time limit only applies to a final appealable judgment. (Axmen's Brief, p. 31.) Though conceding its motion was brought under Rule 59 and/or 60, Axmen argues the time limits of those rules are inapplicable. While a district court generally retains jurisdiction over a case until final judgment, this principle does not obviate the specific requirements of Rules 59

7

and 60. *See, e.g., Johnson v. Eagles Lodge Aerie 3913* (1997), 284 Mont. 474, 478, 945 P.2d 62, 64 (60-day time limit is "mandatory and strictly enforced").

### E.    Judge Henson's Order Was the Law of the Case.

Axmen argues "Montana law is clear that only decisions rendered by the Montana Supreme Court are 'law of the case.'" (Axmen's Brief, p. 36.) This is incorrect. As this Court recently stated: "[W]hen an issue is once judicially determined, that should be the end of the matter as far as successive judges sitting in the same case are concerned." *Teamsters Union Local No. 2 v. C.N.H. Acquisitions, Inc.*, 2009 MT 92, ¶ 16, ___ Mont. ___, 204 P.3d 733; *see also Old Person v. Brown* (9th Cir. 2002), 312 F.3d 1036, 1039 ("[A] court is ordinarily precluded from reexamining an issue previously decided *by the same court*, or a higher court, in the same case." (Emphasis added)).

## II.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO AXMEN ON BREACH OF CONTRACT.

### A.    The District Court Disregarded Undisputed Facts.

Judge Henson found sufficient undisputed evidence to grant summary judgment to Pruyn. Judge Deschamps, viewing the same evidence, concluded there was "no evidence" supporting Pruyn's position. (App. D, p. 12.) In seeking to justify this remarkable reversal, Axmen disregards evidence contrary to its position

and makes no attempt to address the evidence discussed in Pruyn's brief. Indeed, Axmen's Statement of Facts cites almost entirely to one document – Guy Hanson's own self-serving affidavit!

Fundamentally, the notion that Axmen is entitled to summary judgment is based on one purported "undisputed fact": "Starkel drafted the Note according to Pruyn's instructions to create individual liability for Kimbrell and the Hanson's, not Axmen." (Axmen's Brief, p. 4.) Judge Deschamps similarly ruled that it is "crystal clear to the Court that Pruyn understood and intended that the Note was to be a personal responsibility of Kimbrell and the Hansons and specifically not an obligation of Axmen." (App. D, p. 12.) This conclusion disregards the testimony of the individuals who negotiated the loan – Pruyn and Kimbrell – as well as the testimony of the attorney who drafted the note, Starkel.

Pruyn testified without ambiguity that Axmen was the borrower and the parties intended to bind Axmen. (CR 130, 44:15-24; 65:7-11; 81:21-22.) True, Pruyn also wanted the personal signatures and guarantees of all owners of Axmen. (CR 106, p. 102.) Axmen concludes this fact establishes that Axmen, the entity, was not bound by the contract. But more than one party can be bound by a single contract. Kimbrell similarly testified that the loan transaction "was not a transaction that I did as an individual, it was something I did . . . on the business's behalf."

9

(CR 110, Ex. A, 59:15-23.) Starkel testified to his understanding that Kimbrell and the Hansons "were signing [the promissory note] *in their capacities as partners of Axmen Propane.*" (CR 85, Ex. A, 82:5-7 (emphasis added).) Starkel's own billing records show the promissory note was an "Axman [sic] agreement" (CR 85, Ex. B.).

Ignoring these facts, Judge Deschamps concluded it was "undisputed" and "crystal clear" what was intended by Kimbrell and Pruyn, even though contrary to their own testimony. Despite evidence of Kimbrell's unchecked control over Axmen's operations and multiple meetings with Pruyn, Judge Deschamps ruled that Pruyn was "unreasonable" in believing Axmen's president had the capacity to bind Axmen! Judge Deschamps overlooked indisputable material facts provided by Pruyn, Kimbrell, and Starkel to come to a conclusion 180 degrees from what Judge Henson previously held.

**B.     Axmen Is Liable Under the UCC.**

It is unclear how Judge Deschamps applied the UCC, but it makes no difference. As Axmen acknowledges, even under the UCC the dispositive legal issue comes down to Montana common law. (Axmen's Brief, p. 8.) The UCC expressly provides that the signature of a person acting or purporting to act as a representative is binding on the allegedly represented person or entity "to the same extent the represented person would be bound if the signature were on a simple

10

contract." Mont. Code Ann. § 30-3-403(1). "If the represented person is bound, the signature of the representative is the 'authorized signature of the represented person' and the represented person is liable on the instrument, whether or not identified in the instrument." *Id.*

Axmen's discussion of *Carelli v. Hall* (1996), 279 Mont. 202, 205-06, 926 P.2d 756, 758-59 misses the mark. *Carelli* involved a three-person partnership to operate an elk ranch, and a promissory note that only referred to one of the partners. *Id.*, 279 Mont. at 205, 926 P.2d at 758. The payee of the note sued the named and un-named partners. *Id.*, 279 Mont. at 206, 926 P.2d at 759. In a decision that hinged on an interpretation of the UCC *before* its 1991 amendments, this Court held the unnamed partners were not liable under the note. *Id.*, 279 Mont. at 211, 926 P.2d at 762. However, the Court found that the post-1991 version of the UCC could change the outcome: "[U]nder the 1991 version of the UCC, if Hall [the named partner] acted or 'purported to act' on behalf of the Game Ranch partnership and Stires [the un-named partners] in executing the promissory note to Carelli, Stires potentially *could be liable for the debt underlying the note.*" *Id.* (emphasis added).

Axmen's discussion of the UCC is noteworthy for what it omits. Axmen avoids mention of Section 30-3-406, which relates to a party's "[n]egligence contributing to forged signature or alteration of instrument," and precludes

11

Axmen from asserting "the forgery against a person who in good faith pays the instrument. . . ." Mont. Code Ann. § 30-3-406. Axmen also ignores Pruyn's discussion of Section 30-3-404(1), which states that "[a]n unauthorized signature may be ratified for all purposes of this chapter." Mont. Code Ann. § 30-3-404(1). Axmen ratified its president's actions by retaining the benefit of Pruyn's money used to pay Axmen debt. *Id.*; *see also Carelli*, 279 Mont. at 215, 926 P.2d at 764.

## C.     The Parol Evidence Rule Does Not Apply.

The District Court's ruling is based on parol evidence. Indeed, the District Court discussed all manner of extrinsic evidence related to the parties' original intent and Kimbrell's authority, and even quoted at length from a statement Starkel made to police that supposedly made it "crystal clear" what the parties intended. (App. D.)

Further, Axmen relies heavily on extrinsic evidence in defense of Pruyn's contract claim, including its argument that the signatures of two of its three shareholders were forged. For this reason, Axmen's discussion of *Carrelli* is misplaced. In that case, there was no question of validity of the note, fraud or illegality, and the note did not contain the purported signatures of every owner of the represented entity. *See Carelli*, 279 Mont. at 211, 926 P.2d at 762.

Likewise, as discussed above, Section 30-3-403(1) permits extrinsic evidence to explain whether a person signing an instrument was doing so in a representative

12

capacity. *See id.* While extrinsic evidence was not allowed in *Carelli*, the 1991 amendments to the UCC were not applied retroactively in the case precisely because they could have necessitated a different result. *See id.*

## III. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO AXMEN ON UNJUST ENRICHMENT.

Pruyn's money was used to pay Axmen's account at Powderhorn. This is undisputed. The remaining question is whether Axmen should be allowed to retain a windfall at Pruyn's expense.

### A. Pruyn Should Recover In Equity If the Note Does Not Bind Axmen.

"[Unjust enrichment] rests upon the equitable principle that a person shall not be allowed to enrich himself at the expense of another. It is an obligation created by law only in the absence of an agreement between the parties." *Maxted v. Barrett* (1982), 198 Mont. 81, 87, 643 P.2d 1161, 1164. Axmen argues there is no agreement between the parties, but also that there can be no relief in equity because "an express contract governs the obligation." (Axmen's Brief, p. 17.) Axmen cannot have it both ways. If there is a contract, Axmen owes Pruyn. If there is no contract, equitable principles mandate repayment to Pruyn.

The crux of Axmen's argument appears to be that, because the note may be binding as to other parties (*i.e.*, Kimbrell), Pruyn has no claim against Axmen. No

13

authority supports this theory. The case Axmen cites, *Survco v. Kenyon Noble Ready-Mix* (1983), 204 Mont. 411, 415, 664 P.2d 943, 946, stands for the unremarkable proposition that an express contract between the parties is fatal to an implied contract *between the same parties*. The relationship between Axmen and Pruyn is material. Kimbrell's obligations are irrelevant.

## B.     Pruyn Did Not Waive His Claim By Accepting Payments.

Axmen contends Pruyn accepted three payments from Kimbrell and, therefore, waived his right to recover from Axmen. To prevail under this theory, Axmen must establish that Pruyn made "a voluntary and intentional relinquishment of a known right, claim or privilege." *VanDyke Construction Co., Inc. v. Stillwater Mining Co.*, 2003 MT 279, ¶ 15, 317 Mont. 519, 78 P.3d 844. Axmen must further prove that Pruyn's acceptance of payments was inconsistent with his known right to recover from Axmen. *Id.* Finally, Axmen must prove that Pruyn's acceptance of the payments prejudiced it. *Id.*

Axmen presented no evidence that Pruyn's acceptance of payments was inconsistent with his belief that Kimbrell represented Axmen. Two of the three payments Pruyn accepted from Kimbrell occurred in August and September of 2003, *before* Pruyn had any reason to question the validity of the promissory note and Kimbrell's representations to him. The third payment was in April 2004, more than

three years before the District Court determined Kimbrell was acting without authority.

There is no evidence Pruyn knowingly waived his right to recover from Axmen or that his acceptance of payments in 2003 and 2004 was inconsistent with his position in this lawsuit. Moreover, Axmen is unable to demonstrate how Pruyn's acceptance of payments, reducing Axmen's debt, prejudiced Axmen.

## C. Pruyn Satisfied the Elements of Unjust Enrichment.

The undisputed facts establish the elements of Pruyn's unjust enrichment claim. Axmen acknowledges the existence of the debt in its Powderhorn account. Axmen does not dispute that Pruyn's money satisfied that debt. Further, the undisputed facts prove Axmen's negligence in allowing the situation to unfold. While this case is a textbook example of unjust enrichment, Axmen claims its debt at Powderhorn was not "valid," no benefit was conferred by the retirement of its debt, and that Axmen was completely innocent in the matter. Axmen's argument is wrong.

Axmen claims it had no contractual obligation to Powderhorn and would have refused to pay off its account. But there is no dispute that Axmen profited from Kimbrell's purchasing propane futures from Powderhorn before. There is no question Kimbrell had ostensible authority, if not actual authority, to purchase

15

propane from Powderhorn on behalf of Axmen. Thus, Axmen's retroactive limits on Kimbrell's authority would not affect its obligation to Powderhorn.

Axmen also seems to argue its debt would have disappeared when Powderhorn filed for bankruptcy. The trustee in bankruptcy would have had something to say about that.

Finally, Axmen cites to Guy Hanson's self-serving affidavit to claim the Powderhorn obligation belonged to "KGD" – three individuals consisting of Axmen's president Kimbrell, Axmen's employee Shawn Diehl, and Axmen's banker John Giuliani. (Axmen's Brief, pp. 2-3.) But the debt to Powderhorn was in Axmen's account, not the account of "KGD." Not surprisingly, Axmen does not address Giuliani's statement that he had been told any proceeds would go toward decreasing Axmen's debt at Community Bank, just as the first $75,000 in profit was used. (CR 22, Ex. C.) If Axmen is so opposed to these types of transactions, it should return the profits it made on earlier transactions.

Axmen allowed Kimbrell to run the business, purchase propane, incur debt and speak on behalf of the company with virtually no oversight or internal controls. Axmen accepted the fruits of Kimbrell's efforts for years without question but when a transaction went south, it seeks to impose the loss on Pruyn. That is wrong.

**D.    The UCC Does Not Preclude Pruyn's Claim In Equity.**

Contrary to Axmen's suggestion, this Court has applied the doctrine of unjust enrichment in cases involving promissory notes. *See, e.g., In re Marriage of Rock* (1993), 257 Mont. 476, 850 P.2d 296. There is no authority for the sweeping UCC preemption Axmen advocates.

Axmen's own cases underscore the precarious nature of its theory. *Daniels-Sheridan Federal Credit Union v. Bellanger*, 2001 MT 235, 307 Mont. 22, 36 P.3d 397 and *Rudio v. Yellowstone Merchandising Corp.* (1982), 200 Mont. 537, 652 P.2d 1163 both addressed possible displacements of Article 9 priority rules – the possible assertion of an equitable claim within an established hierarchy of secured and unsecured claims. *Id.*, ¶ 39. Those cases have no application here.

**IV.    THE DISTRICT COURT ABUSED ITS DISCRETION IN GRANTING AXMEN ITS ATTORNEY FEES.**

**A.    The Equitable Exception Does Not Apply.**

Axmen claims Pruyn's lawsuit is frivolous because "Pruyn did not intend Axmen to be obligated" when his attorney (who also happened to be the Hansons' attorney) drafted the promissory note. There is a wealth of evidence showing both Pruyn and Kimbrell sought to bind Axmen. That evidence has been discussed above. Suffice it to say that no matter how many times Axmen repeats its erroneous

17

statement of an "undisputed fact," Axmen's own *ipse dixit* cannot negate the record it has chosen to ignore.

Further, even assuming arguendo that Pruyn's contract claim — a claim Judge Henson found sufficiently meritorious to grant summary judgment – was "utterly without merit or frivolous," this disregards Pruyn's alternative theory of recovery, unjust enrichment. *See Tanner v. Dream Island, Inc.* (1996), 275 Mont. 414, 429, 913 P.2d 641, 651. In sum, the District Court's determination that Pruyn's lawsuit was frivolous, "and perhaps even malicious," was an abuse of discretion. (App. G, p. 10.)

## B. The Court Should Give Effect to Montana's Statutes, Not Washington's or California's.

Axmen argues, for the first time on appeal, that the Court should create a new exception to the American Rule. The new exception would impose the statutory rules of other jurisdictions and allow an award of fees under contract to those who are not parties to the contract. (*See* Axmen's Brief, pp. 27-29.)

Axmen's argument is new. Axmen now acknowledges Mont. Code Ann. § 28-3-704 does not allow an award of fees to a non-party to a contract, so Axmen advocates a new judicially-created exception. (Axmen's Brief, p. 27.) In the District Court, however, Axmen argued that Mont. Code Ann. § 28-3-704 *mandated* an award of fees because it provides a "reciprocal remedy." (CR 140, 145.) Axmen's

18

new argument on appeal should be rejected. *See, e.g., Bekkedahl v. McKittrick*, 2002 MT 250, ¶¶ 31-32, 312 Mont. 156, 58 P.3d 175.

In any event, Axmen's theory lacks merit. If Axmen is not a party to or bound by the promissory note, it may not seek enforcement of *any* provision contained therein. *See* Mont. Code Ann. § 28-3-704. While Axmen relies on statutes from Washington and California, those statutes expressly contemplate the recovery of fees by a non-party. *See* RCW 4.84.330 and Cal. Civ. Code 1717(a). The Montana statute, by contrast, expressly states that it is only "parties to the contract or obligation" who may recover fees under the contract. Mont. Code Ann. § 28-3-704.

## V. AXMEN'S *EX PARTE* COMMUNICATIONS VIOLATED PRUYN'S DUE PROCESS RIGHTS.

Axmen declines to explain its *ex parte* contacts to the court, choosing instead expressions of indignation. It was Axmen, however, that attempted to hide by redaction its *ex parte* contacts from counsel's billing records. It was Axmen that sent a "Personal and Confidential" letter to Judge McLean, arguing the merits of the case. Yet Axmen criticizes Pruyn for seeking a real explanation. But it is a real explanation, at the very least, to which Pruyn is entitled.

This Court has been clear – "Justice must satisfy the appearance of justice." *Washington v. Montana Mining Properties, Inc.* (1990), 243 Mont. 509, 516, 795 P.2d 460, 464. In other words, although the Constitution requires an unbiased judge,

19

impartiality itself is <u>not</u> enough. Judges must maintain the appearance of impartiality, and it is counsel's obligation to act at all times to assist the court in that endeavor. In *Washington*, the Court quoted the "eloquent" Lord Hewart for this critically important proposition:

> ... a long line of cases shows that it is not merely of some importance but is of fundamental importance that justice should not only be done, but should manifestly and undoubtedly be seen to be done. Nothing is to be done which creates even a suspicion that there has been an improper interference with the course of justice.

*Id.* (quoting *Rex v. Sussex Justices* (1924), 1 K.B. 256, 259).

Though Axmen attempts to frame the issue as an attack on distinguished public servants, the acts detailed in counsel's billing records strike at the very heart of public confidence in lawyers and the judiciary. This is not a situation to be explained away by affidavits from judges and law clerks. Even in disqualification proceedings – which this is not – it is irrelevant whether the judge believes himself to be impartial. *See* Richard E. Flamm, *Judicial Disqualification*, § 5.6.4, p. 164 (1996). Judge McLean, in his affidavit, states "I regret and apologize for what may appear to be an involvement in the case." (McLean Aff., ¶ 19.) But the rules against *ex parte* contact exist so judicial affidavits assuring the public and the parties of impartiality and proper conduct are *never* necessary.

20

This Court stated it plainly. "The people's confidence in the ability of the courts to administer justice must not be diminished. A state ruled by law cannot afford any perceived notion that justice is not being served by the judiciary." *Washington,* 243 Mont. 516, 795 P.2d 464. That issue is paramount.

Axmen's briefing and attached affidavits raise more questions than answers, and Axmen's brief only begs the question: Why did it decline the opportunity to address the specifics of its *ex parte* contacts? Why did counsel redact the evidence of contacts if the contacts were appropriate? This is particularly important where the initially-redacted information in Datsopoulos, MacDonald & Lind's ("DML") billing records, compared to the District Court docket, reveals substantive rulings within days of the initiation of *ex parte* contacts by counsel:

| Date | DML Attorney or Staff | Description | Hours |
|---|---|---|---|
| 6/28/06 | Dave Cotner | Review Motion filed by Pruyn. **Telephone conference with court personnel.** Draft Renewed Motion for Relief From Opinion and Order. Legal research regarding those issues. ... | 0.80 |
| 7/5/06 | Dave Cotner | Draft Opinion and Order | 3.00 |
| 7/6/06 | Dave Cotner | **Meeting with court personnel.** Telephone conference with Guy Hanson regarding status of proceeding. ... | 1.50 |

(*See* App. K.)

21

On July 6, 2006, the Court issued an Order "over-turn[ing]" Judge Henson's Order granting summary judgment in Pruyn's favor. (App. B, p. 5.)

Six months later, while Pruyn's Motion to Set Aside Judge McLean's Order was pending before Judge Deschamps, DML's billing records reflect:

| 1/22/07 | Dave Cotner | **Meeting with Judge McLean. Telephone conference with Judge McLean.** | 0.30 |
|---------|-------------|-------------------------------------------------------------------------|------|
| 1/22/07 | Dave Cotner | **Draft letter to Judge McLean regarding timeline of ruling.** | 0.50 |

(*See* App. K.) The letter referred to appears to be the "personal and confidential" letter from Mr. Cotner to Judge McLean. (App. P.)

On January 24, 2007, Judge Deschamps signed the Order refusing to set aside Judge McLean's Order. (App. C.)

Finally, while Axmen's Motion for Summary Judgment was pending, DML's billing records reflect the following:

| 7/11/07 | Trent Baker | ... Research _____ . **Phone call with court regarding decision and conference with Dave regarding same.** | 4.30 |
|---------|-------------|---------------------------------------------------------------------------------------------------------------|------|
| 7/12/07 | Dave Cotner | **Meeting with Court officials.** | 1.25 |
| 7/12/07 | SEM | **Prepare for meeting - additional briefs binder.** | 0.50 |

(*See* App. K.)

On July 23, 2007, Judge Deschamps granted Axmen's Motion for Summary Judgment. (App. D.)

Axmen argues "[t]he [Judges' and clerk's] affidavits speak for themselves and make 'known' what Pruyn's attorneys were unwilling to discover prior to filing their appellate brief. . . ." (Axmen's Brief, p. 41.) The affidavits do nothing of the kind, and explanation by Axmen's attorneys is hopelessly vague. For example, when asked to explain a *1.25-hour* meeting with "Court officials" on July 12, 2007, for which Axmen's counsel prepared an "additional briefs binder," Axmen's counsel responded simply that he has "no specific recollection." (App. M.)

Axmen relies on an unsupported conclusory statement "there has been no violation of Pruyn's due process rights." (Axmen's Brief, p. 41.) Pruyn is not obligated to take Axmen's word for it. The evidence demonstrates at least some of the *ex parte* communications instigated by Axmen's counsel involved substantive argument regarding the case to which Pruyn was given no notice or opportunity to respond. These contacts constituted a violation of Pruyn's due process rights.

## CONCLUSION

Pruyn respectfully requests that Judge Henson's March 20, 2006 order be reinstated and affirmed. The case should be remanded to determine Pruyn's attorneys' fees and costs. If the Court determines the case must be remanded for

further proceedings, Pruyn respectfully requests appointment of a new judge given the issues raised on this appeal.

Dated this _6th_ day of May, 2009.

BOONE KARLBERG P.C.

By _____
    Randy J. Cox
    Scott M. Stearns
    Thomas J. Leonard
    *Attorneys for Appellant*

24

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 11(4)(d) of the Montana Rules of Appellate Procedure, the undersigned hereby certifies that the foregoing REPLY BRIEF OF APPELLANT is proportionately spaced, printed with the typeface Times New Roman, 14 point font, is double-spaced, and contains approximately 4,976 words, excluding the Certificate of Compliance and Certificate of Service.

Dated this 6th day of May, 2009.

BOONE KARLBERG P.C.

By _____
Randy J. Cox
Scott M. Stearns
Thomas J. Leonard
*Attorneys for Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that I have filed a true and accurate copy of the foregoing

REPLY BRIEF OF APPELLANT with the Clerk of the Montana Supreme Court;

and that I have served true and accurate copies of the foregoing REPLY BRIEF OF

APPELLANT upon each attorney of record and each party not represented by an

attorney as follows:

Edward Kimbrell
1410 Pinnacle Falls
San Antonio, TX 78260

David B. Cotner
Trent N. Baker
DATSOPOULOS, MACDONALD & LIND
201 West Main, Suite 201
Missoula, MT 59802
*Attorneys for Appellee Axmen Propane, Inc.*

Dated this ⟨⟨illegible⟩⟩ day of May, 2009.

BOONE KARLBERG P.C.

By ⟨signature⟩

Randy J. Cox
Scott M. Stearns
Thomas J. Leonard
*Attorneys for Appellant*

26